**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**BROWNING–FERRIS, INC., Defendant.**

**No. CIV.A.MJG–98–3246.**

United States District Court, D. Maryland.

Sept. 17, 2002.

Debra Michele Lawrence, Arlene T. Shadoan, Gerald S. Keil, EEOC–Baltimore District Office, Baltimore, for Plaintiff.

Christopher G. Bell, Jackson Lewis Schnitzler & Krupman, Minneapolis, MN, for Defendant.

C. Todd Van Dyke, David L. Gordon, Jackson Lewis Schnitzler & Krupman, Atlanta, GA, for Defendant.

## PUBLISHED DECISION ON SUMMARY JUDGMENT

GARBIS, District Judge.

The Court has before it Plaintiff's Motion for Partial Summary Judgment on Liability, Defendant's Cross Motion for Summary Judgment, and the materials submitted by the parties related thereto. The Court finds a hearing unnecessary to resolve the motions.

### I. FACTUAL BACKGROUND

Plaintiff Equal Employment Opportunity Commission ("EEOC" or "Plaintiff")

brings this action on behalf of Deborah J. Brown ("Ms.Brown"), who was employed by Defendant Browning–Ferris, Inc. ("BFI" or "Defendant"), a company that contracts with cities and municipalities to collect, recycle, and dispose of waste. Ms. Brown suffers from Crohn's Disease, a type of inflammatory bowel disorder.

For nearly seven years, beginning in August of 1988, Ms. Brown worked for BFI in different positions in which she was exposed to various types of trash. The EEOC contends that BFI illegally discharged Ms. Brown due to a fallacious belief that Ms. Brown's exposure to trash in her capacity as a BFI employee would compromise her health due to her Crohn's Disease and related medications.

During the tenure of her employment with BFI, Ms. Brown held several different positions and worked a variety of hours including weekend, evening, and pre-dawn shifts and routinely worked overtime. Sometimes, Ms. Brown worked as many as seventy-five hours per week.

Ms. Brown's first position at BFI was "parts runner", a job that entailed collecting parts needed for trucks, transporting those parts to and from the repair, cleaning the parts and the shop, and maintaining inventory of the parts. While a parts runner, Ms. Brown also assisted the compactor repair person in servicing large (room-sized) trash compactor units. These compactors contained "everyday garbage and trash", as opposed to medical or hazardous waste. Pl.'s Mot. for Summ. J. at 2.

While she was a BFI employee, Ms. Brown obtained her commercial driver's license; and, for the remainder of her employment[1], she drove a boom truck— i.e., a twenty-four foot truck with a boom

used for placing and removing trash cans from the truck. *See* Brown Dep. at 97–98. When she was not driving the boom truck, Ms. Brown continued to repair trash compactors. She also spent her non-truck-driving hours painting, welding, and performing truck repairs. In these roles, Ms. Brown engaged in lifting chains, trash can lids, and trash as well as walking, bending, pulling, and pushing. Ms. Brown was performing this combination of duties, which required repeated, prolonged exposure to large quantities of trash, when BFI terminated her employment.

In the early spring of 1989, several months after she began working for BFI, Ms. Brown was diagnosed with Crohn's Disease. Crohn's Disease is an autoimmune inflammatory bowel disease, wherein an individual's cells and bacteria destroy her own intestinal tissues. This causes a thickening of the intestinal wall and a narrowing of the bowel channel. Symptoms of the disorder include extreme abdominal pain, loss of appetite, weight loss, malnutrition, dehydration, fever, diarrhea, flatulence, and fatigue.

Ms. Brown's Crohn's Disease causes her to suffer from chronic diarrhea and loss of appetite and weight.[2] Shortly after she was diagnosed in 1989, she missed two weeks of work at BFI. In the early to mid nineteen nineties, Ms. Brown had periodic flare-ups of her Crohn's Disease and had to have minor surgeries to drain intestinal abscesses. On two occasions, she scheduled these surgeries for a Friday and returned to work the following Monday. In 1994, she missed approximately three weeks of work because of a surgery to drain her abscesses.

Plaintiff contends that despite Ms. Brown's periodic flare-ups, her Crohn's

---

1. The exact dates are not specified.

2. For example, she was diagnosed with the disease after an involuntary weight loss of forty pounds.

Disease did not interfere with her employment at BFI. When she was experiencing a flare-up, Ms. Brown would sharply reduce her food intake during work hours in order to limit bowel activity. Plaintiff also contends that Ms. Brown did not attempt to hide her Crohn's Disease from BFI. *See* Brown Dep. 143–44. Ms. Brown routinely visited BFI's Human Resources ("H.R.") Department to pick up medical insurance forms for Crohn's-related doctor appointments, and she remembers having casual conversations about her disease with BFI H.R. employees when she was there. *See id.* She believed H.R. Manager Karen Huusko ("Huusko") either participated in or at least heard these conversations and was aware that Ms. Brown had Crohn's Disease. *See id.* Also, Ms. Brown regularly advised BFI's safety department about her Crohn's medications to ensure that she could remain certified for her commercial driver's license. *See id.* 144–45.

BFI contends that in early 1995, Ms. Brown's supervisor, Mr. Terry Friskey ("Friskey"), noticed that Ms. Brown had been absent on numerous occasions over a twelve-month period. Upon asking Ms. Brown about these absences and purportedly learning of her Crohn's Disease for the first time, BFI had Doctor Antonio Talusan ("Dr.Talusan") conduct a fitness-for-duty evaluation of Ms. Brown in January of 1995. After conducting the evaluation, Dr. Talusan concluded in written findings that it was dangerous for Ms. Brown to be exposed to BFI waste because her Crohn's Disease and related immuno-suppressive medication made her especially susceptible to infection. Dr. Talusan therefore recommended that Ms. Brown be removed from her job because prolonged and repeated exposure to BFI waste could lead to serious health complications and possibly even death.

BFI contends that after receiving Dr. Talusan's evaluation, it attempted, but was unable, to find Ms. Brown another job within the company for which she was qualified and which would not require repeated, prolonged exposure to waste. In reliance on Dr. Talusan's opinion that Ms. Brown's current position at BFI could lead to serious health problems, BFI terminated Ms. Brown's employment on February 7, 1995, approximately two weeks after Dr. Talusan had evaluated her.

Plaintiff contends that in early January of 1995, following a two-day absence due to a non-Crohn's related stomach flu, she was called to a meeting with her supervisor, Friskey, and H.R. Manager Huusko. At the meeting, Friskey and Huusko questioned Ms. Brown about her absence. When she told them that it was due to a stomach flu, they advised her that they needed to check on the status of her Crohn's Disease and advised her that her position would be terminated if she did not sign a medical release. Ms. Brown signed the release and was involuntarily placed on unpaid leave of absence.

A week later, Huusko informed Ms. Brown that she could not return to work until she underwent a physical examination by Dr. Talusan to see if she was physically fit to perform her job. Plaintiff contends that just three months earlier, another doctor from Dr. Talusan's clinic had examined Ms. Brown and determined that she was fit for duty. Nevertheless, Ms. Brown was examined again on January 25, 1995, this time by Dr. Talusan himself.

Plaintiff contends that Dr. Talusan examined Ms. Brown for fifteen minutes, asking routine questions that Ms. Brown had been asked during previous examinations, to which she gave the same answers. Specifically, she informed the doctor that her Crohn's Disease caused her to experience chronic diarrhea and tenderness in

one area of her stomach, and that she was taking Prednisone, which is an anti-inflammatory steroid, and Imuran, an immunosuppressant which also reduces inflamation and reduces a patient's need for Prednisone. (Plaintiff contends Ms. Brown had provided another doctor in Dr. Talusan's clinic with the same information during the examination three months prior.) As noted above, shortly after the examination, Dr. Talusan prepared written findings in which he indicated that Ms. Brown should not be exposed to waste because of her disease and the immunosuppressive medication she was taking. Approximately two weeks later, BFI fired Ms. Brown.

Shortly after learning of Dr. Talusan's determination, Ms. Brown's own physician and Crohn's Disease specialist, Doctor Jeffrey Garbis [3] ("Dr.Garbis"), telephoned Dr. Talusan to inform him that Ms. Brown's exposure to trash did not impact her physical condition.[4] Dr. Garbis also sent letters to Huusko and Dr. Talusan to this effect after learning that BFI terminated Ms. Brown. In the letter, Dr. Garbis stated, "The opinion that [Ms. Brown] is immunosuppressed by her low dosage of Imuran and runs an increased risk for infection is inaccurate." Letter from Garbis to BFI of 2/14/95.

A week after she was terminated, Ms. Brown received a letter from her surgeon, Dr. James Zalucki ("Dr.Zalucki"), in which he stated that her Crohn's-related flareups were in no way related to her trash removal duties. Letter from Zalucki to Whom it May Concern of 2/13/95. Plaintiff contends that Ms. Brown gave this letter to H.R. Manager Huusko, but Ms. Brown's termination remained final.

## II. PROCEDURAL BACKGROUND

On September 25, 1998, Plaintiff EEOC filed the instant action on Ms. Brown's behalf, alleging a cause of action under the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 et seq. On July 2, 1999, this Court granted BFI's Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiff appealed and, on July 28, 2000, the Fourth Circuit Court of Appeals vacated the order of this Court and remanded the case for further proceedings. By its instant motion, Plaintiff seeks partial summary judgment on the issue of liability. Defendant, by its instant motion seeks summary judgment as to the entire matter.

## III. LEGAL STANDARD

In deciding a summary judgment motion, the Court must look beyond the pleadings and determine whether there is a genuine need for trial. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–53, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the Defendant carries its burden by showing an absence of evidence to support a claim, the Plaintiff must demonstrate that there is a genuine issue of material fact for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

An issue of fact must be both genuine and material in order to forestall summary

---

**3.** No relation to the presiding Judge.

**4.** The record does not reflect whether this call was made before or after BFI fired Ms. Brown.

judgment. An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict in favor of the Plaintiff. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. An issue of fact is material only if the establishment of that fact might affect the outcome of the lawsuit under governing substantive law. *See id.*

## IV. *DISCUSSION*

The ADA was enacted to eliminate discrimination against individuals with disabilities and provides, in pertinent part:

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a) [5].

Entities covered by the ADA include employers, employment agencies, labor organizations, and joint labor-management committees. 42 U.S.C. § 12111(2). There is no doubt that Defendant BFI is a covered entity.

Plaintiff EEOC alleges that Ms. Brown was discharged by BFI because of her Crohn's Disease in violation of the ADA. To establish a *prima facie* wrongful discharge claim under the ADA against BFI, the EEOC must demonstrate that:

1) Ms. Brown is within the ADA's protected class;

2) she was discharged;

3) at the time of her discharge, she was performing her job at a level that met BFI's legitimate expectations; and

4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.

*See Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir.2001) (citing *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio*, 53 F.3d 55, 58 (4th Cir.1995)); *Rhoads v. F.D.I.C.*, 257 F.3d 373, 387, n. 11 (4th Cir.2001).[6]

### A. *Plaintiff's Prima Facie Case*

### 1. *Individual Within the ADA's Protected Class*

■ To establish the first element of its *prima facie* case, Plaintiff must show that Ms. Brown is an individual with a disability within the meaning of the ADA. *See* 42 U.S.C. § 12112(a). The ADA defines "disability" as meeting one of three prongs: 1) having an actual mental or physical impairment that substantially limits one or more of the major life activities of an individual; 2) having a record of such an impairment; or 3) being regarded as having such an impairment. *Id.* at § 12102(2).

Plaintiff contends that Ms. Brown is disabled within the meaning of the ADA because she was in fact disabled and because

---

**5.** Unless otherwise specified, all section references herein are to section 42 of the United States Code.

**6.** Both parties cite the test for establishing a *prima facie* wrongful discharge claim under the ADA articulated in a 1995 Fourth Circuit decision, *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261 (4th Cir.1995), which differs from the test articulated in *Haulbrook* and *Rhoads* as follows. According to *Haulbrook*, 252 F.3d at 702, and *Rhoads*, 257 F.3d at 387,

n. 11, which are 2001 decisions, plaintiff establishes a *prima facie* case by demonstrating, in addition to the other elements, that she was discharged under circumstances that raise a reasonable inference of unlawful discrimination. *Doe*, on the other hand, requires plaintiff to show that she was discharged solely on the basis of her disability. 50 F.3d at 1264–65. The Court will apply the more recent test articulated by the Fourth Circuit in *Haulbrook* and *Rhoads*.

Defendant regarded her as being disabled. In the instant case there is evidence adequate to establish that Ms. Brown's Crohn's Disease is an actual disability under the ADA—i.e., the disease substantially limits her in the major life activities of moving her bowels and eating.

The regulations interpreting the ADA[7] imply that the "regarded as" prong is to be used as a last resort: "if an individual cannot satisfy either the first part of the definition of 'disability' or the second 'record of' part of the definition, he or she may be able to satisfy the third part [i.e., the 'regarded as' prong] of the definition." 29 C.F.R. § 1630.2(1). Accordingly, the Court will analyze the *prima facie* ADA claim under the prong one definition for the purposes of resolving the instant summary judgment motions. Of course, "plaintiff can proceed to trial without deciding under which prong she is covered." *Workman v. Frito–Lay, Inc.*, 165 F.3d 460, 467 (6th Cir.1999).

Other courts have found that Crohn's Disease sufferers are individuals within the meaning of the ADA prong one definition. For example, in *Wilder v. Southeastern Pub. Serv. Auth.*, 869 F.Supp. 409 (E.D.Va.1994), *aff'd.*, 69 F.3d 534 (4th Cir. 1995), the plaintiff, an African–American Crohn's Disease sufferer, contended that he had experienced various adverse employment actions on the basis of his race and disability in violation of 42 U.S.C. § 2000e *et seq.* and the ADA. The court stated, without discussion, "it is undisput-

ed that ... Wilder's Crohn's Disease constitutes a disability." 869 F.Supp. at 417.

In *Nesser v. Trans World Airlines, Inc.*, 160 F.3d 442 (8th Cir.1998), the plaintiff employee suffered from Crohn's Disease and was fired for excessive absenteeism due to Crohn's-related problems. The Eighth Circuit Court of Appeals affirmed the district court's grant of summary judgment to defendant TWA on the ground that the plaintiff failed to show that he was qualified to perform his essential job functions with or without reasonable accommodations. However, when analyzing whether plaintiff had established a *prima facie* ADA claim, the court stated, again without discussion, that "it is clear that Nesser, who suffers from Crohn's Disease, is disabled within the meaning of the ADA". *Id.* at 445.

Similarly, in *Davis v. Guardian Life Ins. Co. of Am.*, No. CIV.A.98–5209, 2000 WL 122357 (E.D.Pa. Feb.1, 2000), the plaintiff had Crohn's Disease, which forced her to miss a significant number of work days. *See id.* at *1. In pursuing her failure to reasonably accommodate ADA claim, Davis established that she was within the ADA's protected class on the ground that her Crohn's Disease was a disability under prong one of the ADA definition—i.e., it substantially limited her in a major life activity. See *id.* at *3; 42 U.S.C. § 12102(2). As in *Wilder*, 869 F.Supp. at 409, and *Nesser*, 160 F.3d at 442, the court analyzed the issue. *See* 2000 WL 122357, at *3. Nevertheless, none of these courts

---

**7.** After the ADA was passed, the EEOC issued regulations and interpretive guidelines to provide additional guidance regarding the proper interpretation of the term "disability" and other parts of the ADA. Section 12116 of the ADA specifically authorizes the EEOC to issue such regulations. On one occasion, the Supreme Court rejected an EEOC guideline. *See Sutton v. United Air Lines*, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (rejecting EEOC's guideline precluding mitigat-

ing measures from consideration when evaluating whether an individual is disabled under the ADA). The Court also suggested that the Commission may have exceeded its authority by interpreting the term "disability". *See id.* Nevertheless, "courts normally defer to the EEOC's regulations and guidelines ... except where they are viewed to be contrary to law." Barbara Lindemann & Paul Grossman, *Employment Discrimination Law* 1208 (3d ed. 1996 & Supp.2000).

doubted that Crohn's Disease was sufficient to bring a plaintiff within the ADA's protected class under the statute's prong one definition of disability.

In the instant case, Plaintiff has presented evidence from which a reasonable jury could [8] find that Ms. Brown's Crohn's Disease renders her disabled under prong one of the ADA definition—that she is substantially limited in the major life activities of moving her bowels and eating. As stated above, the ADA prong one definition of disability is an actual mental or physical impairment that substantially limits one or more of the major life activities of an individual. 42 U.S.C. § 12102(2). The evidence establishes that Ms. Brown Crohn's Disease is an actual physical impairment— i.e., a "physiological disorder, or condition ... affecting one or more of the following body systems: ... digestive." 29 C.F.R. § 1630.2(h).

Under the ADA, "substantially limited" means, *inter alia,* unable to perform or "significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1).

Examples of "major life activities" are "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). Whether an individual has a disability within the meaning of the ADA is to be determined on a case-by-case basis. *See Sutton v. United Air Lines,* 527 U.S. at 483 (1999). The fact that a person with a particular impairment was found to have a disability under the ADA in one case does not mean that another individual with the same impairment is necessarily an individual with a disability under the ADA. *See id.* Moreover, when evaluating whether an individual is substantially limited in a major life activity, courts are to consider mitigating measures, such as medication, and their positive and negative impact on the activity. *See Sutton,* 527 U.S. at 491, 119 S.Ct. 2139; *Murphy v. United Parcel Serv., Inc.,* 527 U.S. 516, 521, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999) (plaintiff not substantially limited in any major life activity because high blood pressure was completely controllable with medication).

Although moving one's bowels and eating are not included as examples of major life activities on the above-detailed list in the regulations, the list is not meant to be exhaustive. *See* 29 C.F.R. § 1630.2(i) ("Major Life Activities means functions *such as* caring for oneself") (emphasis added). Moreover, moving one's bowels and eating are certainly among "those basic activities that the average person in the general population can perform with little or no difficulty." EEOC Interpretive Guidance, ADA Title I & 29 C.F.R. § 1630.2(i). Indeed, other courts have found that moving or controlling one's bowels could qualify as a major life activity within the meaning of the ADA. *See, e.g., Workman v. Frito–Lay, Inc.,* 165 F.3d at 467 ("Regarding the first prong, actual disability, the jury could have decided that controlling one's bowels is a major life activity" in which employee with irritable bowel syndrome was significantly restricted); *Mazza v. Bratton,* 108 F.Supp.2d 167, 174 (E.D.N.Y.2000), *aff'd.* 2001 WL 363513 (2nd Cir.2001) (plaintiff with colitis substantially limited in his ability to perform the major life activity of eliminating waste).

Plaintiff's evidence establishes that, because of her Crohn's Disease, Ms. Brown

8. But, not must.

suffers from chronic severe diarrhea and loss of appetite and weight. *See* Brown Dep. at 123–24. She was first diagnosed with Crohn's following an involuntary weight loss of forty pounds. *See* Pl.'s Ex. 8, excerpts from medical records, at 1. In the first few years following her diagnosis, Ms. Brown had several surgeries to drain abscesses in her intestines. *See id.* at 16; Brown Dep. at 127–28. Since being fired from BFI in 1995, she has had part of her intestinal tract removed and had a colostomy bag attached to her colon for the removal of waste from her body. *See id.* at 67–68. Some days she cannot eat any food. *See* Brown Dep. at 124. This is both because she often has no appetite and because she avoids eating in social situations or at work to avoid having uncontrollable diarrhea. The following deposition testimony is illustrative.

Q: Would it be fair to say that your Crohn's disease affects when you can eat what you want to eat?

A: Yes, it does.

Q: Is that a fair way to characterize it, though?

A: Yes and no. I don't eat during the day. I eat when I go home and I'm in my home for the day, is when I eat something.

Q: Why is that?

A: Because I have severe diarrhea. I do—I do go on myself and at least I am close to a bathroom and I have a change of clothes if I need them.

Brown Dep. at 202–203.

In addition to affecting her ability to control her bowel movements, Ms. Brown's Crohn's Disease sharply limits what she is able to eat. She testified during her deposition:

I don't have an appetite. I eat because I know I have to eat something. At least—I try at least once a day to eat something.... It's pretty much a bland diet.... No fried foods, no spicy foods, no nuts, no chocolates, no caffeine. No vegetables. I have to do like a vegetable a day or a vegetable every couple of days or a couple of weeks to see how it affects me. I pretty much know what I can. And pretty much no matter what I eat even with their bland diet I still have severe diarrhea.

Brown Dep. at 203–204.

At various times since her Crohn's Disease was diagnosed, Ms. Brown has taken Prednisone, Imuran, Asacol, Cipro, and other medications the names of which she cannot recall. *See id.* at 117. There is no evidence that any of these medications mitigates the effect that Crohn's Disease has on Ms. Brown's ability to move her bowels or eat such that the analysis of whether she is disabled under the ADA would be different because of them.

From the foregoing evidence, a reasonable jury could conclude that Ms. Brown is "significantly restricted as to the condition, manner or duration under which [she can move her bowels or eat] as compared to the condition, manner, or duration under which the average person in the general population can perform th[ose] same major life activit[ies]." 29 C.F.R. § 1630.2(j)(1). In other words, a jury could find that Ms. Brown is an individual with a disability under the ADA because her Crohn's Disease renders her substantially limited in one or more major life activity.

2. *Ms. Brown was Otherwise Qualified*

■ In order to survive summary judgment for Defendant BFI, Plaintiff must also present evidence from which a reasonable jury could find that, at the time of her discharge, Ms. Brown was performing her job at a level that met BFI's legitimate expectations. *See Haulbrook,* 252 F.3d at 702. In other words, Plaintiff must show that Ms. Brown was otherwise qualified for her job at BFI. *See* 42 U.S.C. § 12112(a)

(prohibiting discrimination against a *qualified* individual with a disability) (emphasis added).

The ADA defines an otherwise qualified individual with a disability as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds. . . ." 42 U.S.C. § 12111(8). The employer's judgment as to what functions of the job are essential is to be considered in this analysis. *See id.*

BFI does not appear to contend that Ms. Brown failed to meet its legitimate expectations and does not contend that it fired her because she was performing unsatisfactorily. Although BFI makes a general comment regarding Ms. Brown's "excessive absenteeism," it does not present evidence establishing, beyond question, that she was excessively absent. Def.'s Opp'n & Cross Mot. for Summ. J. at 7. On the other hand, Plaintiff presents evidence sufficient to raise genuine issues of material fact as to whether Ms. Brown was excessively absent.

A reasonable jury could conclude from Plaintiff's evidence that Ms. Brown was performing at least satisfactorily when she was fired. For example, four to five months before she was fired, Ms. Brown received a three percent pay increase. Brown Dep. at 99. Ms. Brown's supervisor, Friskey, stated during his deposition that it was within his discretion to give pay increases—i.e., he could give one employee a four percent increase and another employee nothing. Friskey Dep. at 98. Friskey testified that he used the following factors to determine whether an employee got a pay increase: "[w]ork ethics, time being there as being one, how good their

work was or wasn't done, and through an evaluation form that I did." *Id.*

BFI does not offer evidence proving that an employee would receive a pay increase if he or she were not performing satisfactorily. A reasonable jury could, thus, conclude that if Ms. Brown received a three percent pay increase, she was performing at least satisfactorily. Moreover, on Ms. Brown's Record of Employment Separation, BFI checked the "lack of work" box to indicate the reason it fired Ms. Brown. *See* Pl.'s Ex. 18. It did not check the "absenteeism," "tardiness," "insubordination," or "not qualified" boxes. *See id.* Furthermore, if Ms. Brown was not meeting BFI's expectations, either because of excessive absenteeism or some other reason, it presumably would not have attempted to find another position for her at BFI as it contends it did. In sum, there are genuine questions of material fact precluding summary judgment on the question of whether Ms. Brown was meeting BFI's legitimate expectations when fired.

■ BFI contends that Ms. Brown was not qualified to perform her job because Dr. Talusan determined that, for Ms. Brown's own safety, she could not be exposed to large quantities of waste on a repeated and prolonged basis. Without overtly stating so, BFI essentially contends that Ms. Brown could not perform the essential function of performing her job without posing a direct threat of harm to herself.[9]

The ADA permits an employer to define as a job qualification the requirement that "an individual . . . not pose a direct threat to the health or safety of [the individual him or herself or] other individuals in the workplace." 42 U.S.C. § 12113(b); 29

---

9. BFI presents this argument in the context of its "Direct Threat" affirmative defense. However, it applies equally to the present discus-

sion. For the sake of efficiency, the Court will discuss the issue here.

C.F.R. § 1630.2(r) (adding "the individual him or herself" to the definition).

The risk of a direct threat of harm, however, must be significant. *See id.* An employer may not

> deny an employment opportunity to an individual with a disability merely because of a slightly increased risk. The risk can only be considered when it poses a significant risk, i.e., high probability, of substantial harm; a speculative or remote risk is insufficient.

EEOC Interpretive Guidance on 29 C.F.R. § 1630.2(r).

The determination of whether an individual poses a direct threat of harm must be based on a case-by-case "assessment of the individual's *present* ability to safely perform the essential functions of the job." 29 C.F.R. § 1630.2(r) (emphasis added). It must not be based on stereotypes or generalizations about the effects of a disability. *See id.; Montalvo v. Radcliffe,* 167 F.3d 873, 876 (4th Cir.1999).

> This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence.

29 C.F.R. § 1630.2(r); *See Montalvo,* 167 F.3d at 876–77 ("An individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence" must be made).

The following factors are to be considered when the determination of whether the individual poses a significant risk to herself is made: the duration of the risk; the nature and severity of the potential harm; the likelihood that the harm will occur; and the imminence of the potential harm. *See* 29 C.F.R. § 1630.2(r). Evidence relevant to the direct threat determination

> may include input from the individual with a disability, the experience of the individual with a disability in previous similar positions, and opinions of medical doctors, rehabilitation counselors, or physical therapists who have expertise in the disability involved and/or direct knowledge of the individual with the disability.

EEOC Interpretive Guidance on 29 C.F.R. § 1630.2(r).

It is not disputed that repeated and prolonged exposure to large volumes of waste was an essential function of Ms. Brown's job. In determining that Ms. Brown could not perform this function without posing a direct threat of harm to herself, BFI relied exclusively on Dr. Talusan's opinion that such exposure would have been especially dangerous to Ms. Brown because of her Crohn's Disease and related medications. Letter from Talusan to Husko of 1/25/95 ("Talusan Letter"); Def.'s Cross Mot. for Summ. J. at 15.

Dr. Talusan is an internist who spent a significant part of his career in the Philippines studying and treating people with kidney diseases. *See* Talusan Dep. at 8. In 1987, he began practicing occupational medicine in a clinic in the United States. *See id.* At the time he examined Ms. Brown, Dr. Talusan and the two other doctors in the clinic saw approximately 80 to 120 patients per day through contractual arrangements with clients such as BFI. *See id.* at 15–17. In this capacity, Dr. Talusan conducted pre-employment physicals, fitness for duty evaluations, and drug testing and treated people for work-related injuries. *See id.*

According to Dr. Talusan's own testimony, he is neither a Crohn's specialist nor a gastroenterologist and has not treated Crohn's patients for over forty years. Talusan Dep. at 24–25. When asked what kind of experience he has had with regard to treating the disease, he stated:

A: Treating Crohn's disease? Limited. I would say that it was during my training years here and as a resident trainee in medicine that I have seen, experienced, and treated people with Crohn's disease.

Q: So we're talking about from 1956 through 1961?

A: That's correct, ma'am.

* * * * * *

Q: So you don't consider yourself an expert in Crohn's disease?

A: I would not say so.

*Id.*

Dr. Talusan is familiar with Prednisone and Imuran, the two medications he believed, in conjunction with Crohn's Disease, caused Ms. Brown to pose a direct threat of harm to herself. *See id.* at 26. He spent a significant part of his career prescribing Prednisone to kidney disease patients in the Philippines. *See id.* He primarily prescribed the drug to kidney transplant recipients for the purpose of suppressing the immune system in order to reduce the likelihood of the body rejecting the new kidney. *See id.* at 27. He also prescribed Imuran for the same purpose during the years that he treated kidney disease patients. *See id.* at 29. Since approximately 1987, when he stopped his kidney disease practice, Dr. Talusan has prescribed Prednisone only very rarely, and usually only to treat temporary allergic reactions such as those caused by bee stings or plastic gloves. *Id.* at 27–28.

Dr. Talusan made his determination about Ms. Brown by considering:

1. his own approximately fifteen-minute meeting with Ms. Brown [10];

2. his experience with Prednisone and Imuran;

3. his research on Crohn's Disease;

4. his review of Ms. Brown's medical records made by her Crohn's physicians, Zalucki and Garbis, and her primary care physician, Dr. Bruce Conger; and

5. Ms. Brown's Crohn's related absences and surgeries while employed by BFI.

*See* Def.'s Opp'n & Cross Mot. for Summ. J. at 29. Though Dr. Talusan reviewed their medical records of Ms. Brown, he did not consult any of the doctors who had been, and were contemporaneously treating Ms. Brown for her Crohn's Disease.

BFI contends that when H.R. Manager Huusko asked Dr. Talusan to examine Ms. Brown, she authorized him to send Ms. Brown to a specialist if he deemed it necessary to determine whether she was fit for duty. *See* Abell [11] Dep. at 100. Dr. Talusan does not recall receiving such authorization. *See* Talusan Dep. at 111–13. Regardless, Dr. Talusan saw no need to send her to a specialist; and no specialist was consulted. *See id.* at 112.

Dr. Talusan's research on Crohn's Disease in relation to his evaluation of Ms. Brown consisted of reading two medical textbook [12] articles on the disease. Dr. Talusan testified at his deposition that neither article discussed a Crohn's sufferer's external environment nor their susceptibility to infection. Talusan Dep. at 89. He admitted that he was not aware of any literature addressing whether such external environmental factors impacted per-

10. During which he checked her ears, nose, throat, and blood pressure, had Ms. Brown run in place, checked her blood pressure again, listened to her chest and heart, and talked with Ms. Brown about her Crohn's Disease.

11. Apparently, Ms. Huusko's name changed to Abell at some point.

12. The articles were contained in general medical textbooks: The Textbook of Medicine by Harrison; and The Textbook of Medicine by Cecil & Lloyd.

sons with Crohn's Disease, and he did not conduct any literature search on the matter. *Id.* at 56–57. Dr. Talusan stated that what concerned him after reading these articles was the risk of peritonitis and sepsis in Crohn's patients, which can cause death. *Id.* at 91. He believed that Ms. Brown was at an increased risk of contracting peritonitis and sepsis because of her exposure to waste at BFI.

In his written findings, Dr. Talusan concluded, in pertinent part:

[Ms. Brown] has been on immunosuppressive therapy since 1990 ... [which] would depress the individual's ability to defend against infection.

Crohn's Disease is a lifelong disease which would require lifetime treatment. Complications such as what Ms. Brown has had must be minimized. This may lead to life-threatening consequences such as perforations and intestinal obstructions.

When Ms. Brown's job description was reviewed, it was noted that she would be exposed to the bacteriologic risk in waste. Ms. Brown, with her Crohn's Disease and immunosuppressive treatment would, therefore, be exposed to the prolonged and repeated risk of infection. She has had three infection complications of her Crohn's Disease in two (2) years.

I, therefore, hereby conclude that Ms. Brown, with Crohn's Disease and on immunosuppressive therapy, will be unable to perform her present job description. A reasonable accommodation is, therefore, recommended by removing her from the bacteriologic risk offered by waste exposure.

Talusan Letter at 2.

Regarding why he believed that Ms. Brown was at an increased risk of harm at BFI, Dr. Talusan stated, "I think simple logic would suggest that when you're working in an infected area, you have a higher chance of getting infection". Talusan Dep. at 98. He also commented on the Crohn's-related surgeries Ms. Brown had during the years preceding her termination by BFI, characterizing them as warning signs that Ms. Brown was heading into problems and noting that he would not want her, while on immunosuppressive medications, to be subjected to the increased risk of infection presented by the large quantities of waste at BFI. *See id.* at 102. Dr. Talusan admitted that these surgeries may have been necessary simply because of the Crohn's Disease itself, but his testimony and his written findings indicate his belief that there was a connection between the surgeries, Ms. Brown's immunosuppressant medications, and her exposure to trash at BFI. *Id.* at 103.

Dr. Talusan found no medical basis on which to "quantitate" how long Ms. Brown would need to be exposed to BFI waste in order to get a trash-related infection. *See* Talusan Dep. at 66. He simply stated, "the more you are exposed, the more chances, the longer you're exposed, the longer the chance, the better or the higher are the chances you can develop the infection". *Id.*

Though the likelihood that harm would occur was unquantifiable, Dr. Talusan believed the nature of the risk was very severe. He testified that Crohn's Disease has a five to ten percent mortality rate. *Id.* at 67. Dr. Talusan's "medical deduction of the chain of information" was that because of her Crohn's Disease and her immuno-suppressant medications, Ms. Brown was at risk of contracting sepsis and/or peritonitis, possibly resulting in her death, by her continued exposure to waste at BFI. *Id.* at 92.

The doctors who have treated Ms. Brown for her Crohn's Disease, Doctors Garbis and Zalucki, disagree with Dr. Talusan's conclusion regarding the risk of

harm posed to Ms. Brown by her job at BFI. For example, Dr. Zalucki, the surgeon who operated on Ms. Brown to drain her Crohn's related abscesses, wrote the following in a letter to BFI regarding the surgeries:

Deborah J. Brown has Crohn's disease, which causes her gastrointestinal tract to intermittently become inflamed. This inflammation allows bacteria, which are normally contained within the intestinal tract; [sic] the opportunity to cause infections in surrounding tissues.

Thus, Ms. Brown's anorectal abscesses are a result of her Crohn's disease and are in no way related to her duties of trash removal.

Letter from Zalucki to Whom it May Concern of 2/13/95.

Dr. Garbis, a gastroenterologist and Ms. Brown's Crohn's Disease treating physician since 1992, wrote a letter to BFI in which he strongly disagreed with Dr. Talusan's opinion regarding Ms. Brown's risk of infection at BFI. Letter from Garbis to BFI of 2/14/95. He saw no reason why her exposure to trash at BFI would jeopardize her health and stated that the opinion that her immunosuppressant medication caused her to have an increased risk of infection was inaccurate. *See id.*

Plaintiff's expert, Dr. Bedine, is a gastroenterologist who has worked with Crohn's patients for thirty years and conducted his own physical examination of Ms. Brown. In Dr. Bedine's opinion, Ms. Brown's infections were caused by her Crohn's Disease and had nothing to do with her exposure to trash at BFI. Bedine Dep. at 30. He has never felt that any of his Crohn's patients on Prednisone and Imuran should consider not working in a certain environment because of an increased risk of infection. *Id.* at 16. He believes there is no connection between a patient with Crohn's Disease, where they

work, and how many infections they have. *Id.* at 17.

Based on his experience with Crohn's Disease, his physical examination of Ms. Brown, and his consideration of her history, Dr. Bedine concluded that Ms. Brown "could continue her job, [and] that there was no risk of developing complications from her Crohn's Disease from continuing in that job." Bedine Dep. at 27–28. He is not aware of any studies showing Crohn's patients cannot perform normal work activity. *See id.* at 29–30. Because of his knowledge of the disease and the level of Ms. Brown's dosage of Prednisone and Imuran, Dr. Bedine found unreasonable Dr. Talusan's conclusion that Ms. Brown was at a risk of significant harm at BFI. *See id.* at 29–30. If there was any risk that Ms. Brown was more likely to contract an infection from exposure to BFI trash than a person without Crohn's Disease who was not on immuno-suppressants, Dr. Bedine testified that any such risk would be very small. *Id.* at 45.

As noted above, BFI terminated Ms. Brown on February 7, 1995, approximately two weeks after Dr. Talusan examined her. The decision was made strictly in reliance on Dr. Talusan's opinion and because of BFI's purported inability to find Ms. Brown another job at BFI for which she was qualified and which would not expose her to large quantities of trash on a prolonged basis. The letters from Ms. Brown's physicians were not received by BFI until after it decided to fire Ms. Brown, and there is no evidence that BFI sought input from Ms. Brown's doctors before deciding to fire her.

Based on the foregoing evidence, a reasonable jury could find that, by relying exclusively on Dr. Talusan's opinion in deciding to terminate Ms. Brown, Defendant BFI did not meet its legal obligations under the ADA to make a reasonably in-

formed and considered employment decision. A jury could conclude that BFI's assessment of Ms. Brown, based entirely on the opinion of a physician with minimal experience treating Crohn's Disease patients who spent fifteen minutes examining Ms. Brown, was based on neither the most current medical knowledge or the best available objective evidence. *See* 29 C.F.R. § 1630.2(r).

It does not appear that BFI sought input from any medical doctors with expertise in the disability involved or doctors with any direct knowledge of Ms. Brown and her individual history with Crohn's Disease. *See* EEOC Interpretive Guidance on 29 C.F.R. § 1630.2(r). Nor did BFI appear to lend any credence to Ms. Brown's own belief that there was no significant risk. *See id.*

In sum, there are genuine issues of material fact on the question of whether BFI made a reasonably informed and considered determination, based on the most current medical knowledge and/or the best available objective evidence as well as an individualized assessment of Ms. Brown, that there was a significant risk that Ms. Brown posed a direct threat of harm to herself.

### 3. The Circumstances Raise a Reasonable Inference of Discrimination

The final element of Plaintiff's *prima facie* case for an ADA claim is that Ms. Brown's discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. *See Haulbrook*, 252 F.3d at 702. The parties have not specifically briefed this issue because, as noted above, both rely on an earlier Fourth Circuit decision stating that, rather than showing circumstances raising a reasonable inference of unlawful discrimination, a plaintiff must demonstrate that she was fired solely on the basis of disability.

*See Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d at 1264–65.

BFI concedes that it decided to fire Ms. Brown because of her Crohn's Disease but denies that it did so in violation of the ADA. Plaintiff has presented evidence sufficient to establish circumstances that raise a reasonable inference of discrimination.

In sum, the evidence is sufficient to permit, although not require, a reasonable jury to find that Plaintiff has established a *prima facie* case on her ADA claim. Accordingly, Defendant is not entitled to summary judgment on the ground that Plaintiff has failed to establish a *prima facie* case. On the other hand, Plaintiff is not entitled to summary judgment because of the existence of genuine issues of material fact as to her *prima facie* case.

### B. Defenses

BFI contends that it has an affirmative defense in that Ms. Brown posed a direct threat of harm to herself. BFI also contends that it did not discriminate on the basis of Ms. Brown's disability because it had a good faith belief that Ms. Brown should have been terminated.

### 1. Direct Threat Defense

■ Under the ADA,

It may be a defense to a charge of discrimination ... than an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity .... The term "qualification standards" may include the requirement that an individual shall not pose a direct threat to the health or safety [of the individual him or herself or] of other individuals in the workplace.

42 U.S.C. § 12113; *see* 29 C.F.R. § 1630.2(r) (adding "the individual him or herself").

The analysis of whether an individual poses a direct threat of harm to him or herself is no different in the context of an affirmative defense under the ADA than it is in considering whether an ADA complainant is qualified for her position. As discussed above, there are genuine issues of material fact regarding whether Ms. Brown posed a direct threat of harm to herself. BFI is thus not entitled to summary judgment on the ground that it has a "Direct Threat" affirmative defense.

### 2. *BFI's Good Faith Reliance on Dr. Talusan's Opinion*

The remaining issue is whether BFI can establish a defense as a matter of law on the ground that it relied in good faith on Dr. Talusan's opinion.

As noted above, the ADA requires employers to conduct an individualized assessment of whether an individual with a disability poses a direct threat of harm before taking an adverse employment action. 29 C.F.R. § 1630.2(r). This assessment must be "based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence." *Id.* In *Bragdon v. Abbott,* 524 U.S. 624, 649, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998), the Supreme Court found that a good-faith belief that a significant risk of harm exists is insufficient if it is not grounded in medical or other objective, scientific evidence. The Court stated that the defendant's "belief that a significant risk existed, even if maintained in good faith, would not relieve him from liability." *Id.* at 649, 118 S.Ct. 2196.

Defendant BFI contends that its good faith belief in Dr. Talusan's opinion is alone sufficient to exempt it from liability under the ADA. Even assuming BFI could establish that it relied in good faith on Dr. Talusan's opinion, BFI cites no authority establishing that such good faith reliance, independent of whether the medical judgment was reasonable and based on the most current or objective medical knowledge, provides an absolute defense under the ADA.

The decisions BFI relies on in support of its contention do not persuade the Court as Defendant would wish. For example, in *Lowe v. Ala. Power Co.,* 244 F.3d 1305 (11th Cir.2001), the defendant employer relied on its doctor's determination that the plaintiff-amputee could not perform his job safely. The doctor made this determination on the basis of an approximately one hour examination of the plaintiff, an examination the court described as "cursory." *Id.* at 1306. The Eleventh Circuit reversed and remanded the district court's decision granting summary judgment to the employer because it found that the defendant's determination, on the basis of the doctor's cursory examination of the plaintiff, was not based "on particularized facts using the best available objective evidence as required by the regulations." *Id.* at 1309.

In *Smith v. Chrysler Corp.,* 155 F.3d 799 (6th Cir.1998), the defendant employer relied on a letter from the employee's physician diagnosing the employee with narcolepsy and fired the employee for failing to disclose the condition on a pre-employment medical questionnaire. The Sixth Circuit affirmed the district court decision granting summary judgment to the employer on the ground that even though it was mistaken, the employer had a good faith belief that the employee lied on the questionnaire. However, the court noted its rejection of the so-called "honest belief rule"— i.e., permitting the employer to escape ADA liability if it honestly, albeit mistakenly, believed in its proffered non-discrimi-

natory reason for its employment decision—to the extent that the defense allows an employer to make an employment decision without ensuring that it is reasonably based on particularized facts. *Id.* at 806.

We find such an abstract application of the rule to be at odds with the underlying purpose behind the [ADA]—i.e., that employment actions taken regarding an individual with a disability be grounded on fact and not "on unfounded fear, prejudice, ignorance, or mythologies." 136 Cong. Rec. § 7422–03, 7437 (daily ed. June 6, 1990) (statement of Sen. Harkin). To the extent the Seventh Circuit's application of the "honest belief" rule credits an employer's belief without requiring that it be reasonably based on particularized facts rather than on ignorance and mythology, we reject its approach.

*Id.* at 806.

In the instant case, BFI's reliance upon Dr. Talusan's opinion would not necessarily immunize it from liability. As discussed above, there are genuine issues of material fact as to whether Dr. Talusan's opinion was based on particularized facts using the best available objective evidence. Accordingly, BFI is not entitled to summary judgment on the ground that it relied upon Dr. Talusan's opinion.

## V. *CONCLUSION*

For the foregoing reasons:

1. Plaintiff's Motion for Partial Summary Judgment is DENIED.

2. Defendant's Cross Motion for Summary Judgment is DENIED.

3. The case shall proceed to trial.