**TAO OF SYSTEMS INTEGRATION, INC., Plaintiff,**

v.

**ANALYTICAL SERVICES & MATE-RIALS, INC., Defendant and Counterclaim Plaintiff,**

Dr. Jalaiah Unnam, and Dr. Venki S. Venkat f/k/a Dr. Subbiah Venka-teswaran, Defendants,

v.

Tao Of Systems Integration, Inc., and Dr. Siva Mangalam, Counterclaim Defendants.

No. 4:03CV67.

United States District Court, E.D. Virginia, Newport News Division.

Aug. 11, 2004.

Ellen D. Marcus, Esquire, Virginia M. Sadler, Esquire, Aitan D. Goelman, Esquire, Zuckerman Spaeder LLP, Washington, DC, for Plaintiff and Counter–Defendants.

Alan Dale Albert, Esquire, David K. Sutelan, Esquire, LeClair Ryan PC, Norfolk, VA, George H. Bowles, Esquire, Troutman Sanders LLP, Norfolk, VA, for Defendants and Counter–Claimant.

### *OPINION AND FINAL ORDER*

REBECCA BEACH SMITH, District Judge.

This matter comes before the court on three motions: defendants' motion for summary judgment, counterclaim defendants' motion for summary judgment, and plaintiff's motion to amend the complaint. For the reasons set forth below, the court **GRANTS** summary judgment to defendants on Count Two, **DENIES** summary judgment to defendants on Count Three, and **GRANTS** summary judgment to counterclaim defendants on the counterclaim. Plaintiff's motion to amend is **DENIED** as moot, and the court declines to exercise supplemental jurisdiction over Count Three and **DISMISSES** it without prejudice.

### I. *Factual and Procedural History*

Plaintiff and counterclaim defendant Tao of Systems Integration, Inc. ("Tao"), a Virginia corporation headquartered in Williamsburg, Virginia, and defendant and counterclaim plaintiff Analytical Services & Materials, Inc. ("AS & M" or "ASM"), a Virginia corporation headquartered in Hampton, Virginia, both operate in the aeronautical engineering services market. AS & M was founded in 1983 by its president, defendant Dr. Jalaiah Unnam. From 1985 to 1994, plaintiff and counterclaim defendant Dr. Siva Mangalam was employed at AS & M, and was, at least part of that time, a partner. In 1994, Dr. Mangalam left AS & M to found Tao. Defendant Dr. Venki S. Venkat, formerly known as Dr. Subbian Venkateswaran, has worked in the past for both Tao and AS & M.

Tao currently has two claims before the court. In the first of these, Count Two, Tao alleges that defendants misrepresented to the National Aeronautics and Space Administration ("NASA") that Tao's intellectual property belonged to AS & M, and that these misrepresentations constitute false advertising or promotion in violation of § 43(a) of the Lanham Act. In the second claim, Count Three, Tao has alleged

that defendants misappropriated the results of an experiment conducted by Tao, in violation of the Virginia Uniform Trade Secrets Act ("VUTSA"). Tao alleges that as a result of these misrepresentations, AS & M was granted valuable services contracts by NASA. Moreover, Tao alleges that because NASA has come to associate Tao's intellectual property and expertise with AS & M, Tao has had difficulty securing new contracts with NASA.[1]

On March 31, 1994, Tao executed an agreement with NASA's Langley Research Center, under which Tao would conduct flutter instrumentation testing at Langley Research Center's Transonic Dynamic Tunnel. The flutter instrumentation testing was conducted from April 1994 through June 1994. Dr. Venki[2] was among the engineers involved in the data analysis for this project. Around the time of the flutter testing project, Dr. Venki left the employ of Tao and began employment at AS & M. Tao has alleged that Dr. Venki took flutter test results from Tao and provided them to AS & M.

In June 1995, AS & M filed a proposal in response to a NASA request for proposals, RFP4–00001, for an Engineering and Technical Services ("ETS") contract with NASA's Dryden Flight Research Center in Edwards, California. Tao alleges that the ETS proposal contained a number of misrepresentations in which AS & M took credit for expertise and capabilities belonging to Tao. Tao further alleges that the ETS proposal suggested that AS & M,

rather than Tao, had performed the flutter testing at Langley Research Center. AS & M was awarded the ETS contract in 1995.[3]

At some point afterward, Dr. Mangalam received a copy of AS & M's ETS proposal from Walter Kalman, the operator of Kalman & Co., an engineering support services company in the Norfolk area. AS & M has counterclaimed under VUTSA, asserting that by acquiring, disclosing, or using a copy of AS & M's confidential 1995 ETS proposal, Dr. Mangalam and Tao had misappropriated AS & M's trade secrets.

On July 6, 2004, plaintiff Tao filed its motion for leave to amend, seeking to add four new claims. Defendants filed a response on July 16, 2004, and plaintiff filed its reply on July 26, 2004. On July 13, 2004, defendants filed their motion for summary judgment on Counts Two and Three. Plaintiff's response was filed July 26, 2004, and defendants' reply was filed July 29, 2004. Also on July 13, 2004, counterclaim defendants filed their motion for summary judgment. The response and reply on this motion were received on July 26, 2004, and August 2, 2004, respectively. Accordingly, all three motions have been fully briefed and are ripe for review.

## II. Legal Standards

Summary judgment under Federal Rule of Civil Procedure 56 is appropriate only when the court, viewing the record as a whole and in the light most favorable to

---

**1.** Plaintiff also asserted an alternate theory under the Lanham Act, additional claims of trade secret misappropriation, and a claim for unjust enrichment, all of which were dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). *Tao of Sys. Integration v. Analytical Servs. & Materials, Inc.*, 299 F.Supp.2d 565 (E.D.Va.2004).

**2.** The briefs have generally referred to Dr. Venki Venkat as "Dr. Venki," although occa-

sionally they have referred to him as "Dr. Venkat." For purposes of consistency, the court adopts the former usage.

**3.** Plaintiff also alleges misrepresentations in AS & M's 1998 response to a NASA request for data, a 2001 proposal for a second ETS contract (which AS & M also won), and 2002 presentations given at NASA Langley.

the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party may not rest upon mere allegations in the pleadings, but must set forth specific facts illustrating genuine issues for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Conclusory allegations do not suffice to resist summary judgment, *Thompson v. Potomac Elec. Power Co.,* 312 F.3d 645, 649 (4th Cir. 2002), nor can the nonmoving party create a genuine issue of material fact "through mere speculation or the building of one inference upon another," *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985). Moreover, the existence of a scintilla of evidence in support of the nonmoving party's position is insufficient. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. Rather, the evidence must be such that the fact-finder reasonably could find for the nonmoving party. *Id.*

### III. Analysis

#### A. Defendant's Motion for Summary Judgment on Counts Two and Three

Defendants seek summary judgment on both the Count Two claim of false advertising, brought under the Lanham Act, and the Count Three claim of trade secret misappropriation, brought under the Virginia Uniform Trade Secrets Act. Because the two claims involve distinct facts and legal issues, they are discussed separately.

#### 1. Count Two: False Advertising Under the Lanham Act

Defendants advance five principal arguments in favor of summary judgment on Count II:(1) that the 1995 ETS proposal, a sealed bid for a government contract, cannot constitute commercial advertising or promotion; (2) that plaintiff lacks standing to bring a false advertising claim, as plaintiff is not in commercial competition with AS & M; (3) that plaintiff cannot show that any alleged false advertising has caused it injury; (4) that none of the statements challenged by plaintiff were material to AS & M's selection for the 1995 ETS contract; and (5) that none of the challenged statements are false or misleading. Because consideration of the third of these arguments—that plaintiff has not put forth sufficient evidence concerning causation and injury—is adequate to decide this matter, the court does not address defendants' other grounds.

Section 43(a) of the Lanham Act provides a civil cause of action against a person who misrepresents the "nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities" in "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). A plaintiff may seek three remedies for a violation of § 43(a): (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. 15 U.S.C. § 1117(a). These remedies are "subject to the principles of equity." *Id.*

The Court of Appeals for the Fourth Circuit has adopted a five-element test for adjudicating false advertising claims under the Lanham Act. To recover, the plaintiff must establish that

(1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product;

(2) the misrepresentation is material, in that it is likely to influence the purchasing decision;

(3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience;

(4) the defendant placed the false or misleading statement in interstate commerce; and

(5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

*Scotts Co. v. United Indus. Corp.,* 315 F.3d 264, 272 (4th Cir.2002) (quoting *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.,* 284 F.3d 302, 310–11 (1st Cir.2002)). The fifth element, plaintiff's injury as a result of the misrepresentation, is at issue here.

■ Although the *Scotts Company* test speaks only of injury to the plaintiff, the availability of the defendant's profits as a potential Lanham Act remedy suggests that a broader reading of that element is appropriate. Proof of injury to the plaintiff is logically relevant only to the remedy of damages. To focus exclusively on injury to the plaintiff has the effect of "read[ing] out of the Lanham Act" a remedy, such as recovery of the defendant's profits, that does not flow from the plaintiff's injury. *Web Printing Controls Co. v. Oxy–Dry Corp.,* 906 F.2d 1202, 1205 (7th Cir.1990). Consequently, although a court's test may refer only to "injur[y] as a result," *Logan v. Burgers Ozark Country Cured Hams, Inc.,* 263 F.3d 447, 462 (5th Cir.2001), or "harm to the plaintiff," *Balance Dynamics Corp. v. Schmitt Indus., Inc.,* 204 F.3d 683, 689 (6th Cir.2000), an inability to demonstrate such injury or harm does not preclude a plaintiff from recovering the defendant's profits. Rather, this determination turns on whether the defendant has benefited from his false advertisements. *Logan,* 263 F.3d at 465 ("[W]here a plaintiff who has brought a Lanham Act claim for false advertising has failed to present evidence that the defendant benefited from the alleged false advertising, the plaintiff will not be permitted to recover any of the defendant's profits."); *Balance Dynamics,* 204 F.3d at 695 ("[U]nless there is some proof that plaintiff lost sales or profits, or that defendant gained them, the principles of equity do not warrant an award of defendant's profits.").

■ Accordingly, the court finds that the fifth element of the *Scotts Company* test should not be read restrictively to require an injury to the plaintiff in every case, but expansively to recognize a valid claim when plaintiff can alternatively (or additionally) demonstrate a benefit to the defendant.[4] The plaintiff's injury or the defendant's gain must be "a result of [the defendant's] misrepresentation," *Scotts Co.,* 315 F.3d at 272. If the plaintiff is unable to establish this "causal link" to the defendant's actions, the plaintiff has no sustainable claim under the Lanham Act, and the defendant must be granted summary judgment. *Xoom, Inc. v. Imageline, Inc.,* 323 F.3d 279, 286 (4th Cir.2003); *see also Logan,* 263 F.3d at 465 (affirming judgment as a matter of law for the defendant because the plaintiff had failed to present evidence that the defendant's profits were attributable to false advertising).

Defendants argue that plaintiff has failed to come forward with evidence tending to demonstrate a causal connection between the alleged false advertising committed by AS & M and any injury to plaintiff. Plaintiff argues in response that no such showing is necessary, but that record evidence nonetheless supports its claims. As the above recitation of the relevant precedents indicates, the court is convinced that plaintiff is indeed required

---

4. If the court were to instead apply the more restrictive reading, it would not change the result in this case.

to come forward with evidence of a causal connection between AS & M's alleged false advertising and either injury to plaintiff, or benefit to defendants. Accordingly, the court turns to an evaluation of plaintiff's evidence.

### a. Harm or Injury to Plaintiff

Plaintiff cites to only two sources to support its claim of injury: (1) four pages of plaintiff's own answer to an interrogatory (Pl.'s Mem. in Opp.App. at 1235–38), and (2) six pages of the deposition of William D. Harvey, a former employee of both AS & M and Tao (*id.* at 1433–38). Neither source provides evidence of the required causal connection between AS & M's actions and injury to plaintiff.

As a threshold matter, the court observes that while an opposing party's answers to interrogatories are generally admissible as statements of a party opponent, a party's own answers to interrogatories are not admissible on the same basis. 8A Charles Alan Wright, Arthur R. Miller and Richard L. Marcus, *Federal Practice and Procedure* § 2180, at 340–41 (2d ed.1994). The court is unable to determine from the segment of the interrogatory response presented in the record whether the answer cited by plaintiff was made on personal knowledge and sworn under oath, the basic requirements necessary to turn an allegation into evidence which may be considered by a court. Even assuming that this interrogatory answer may be properly considered by the court, however, it still does not create a triable issue of fact regarding causation.

The interrogatory answer lists a number of plaintiff's proposals that were rejected by NASA. The answer alleges, without further evidentiary support, that misrepresentations by AS & M were responsible for the rejection of these proposals, and responsible for other economic harm to plaintiff. Conclusory allegations of this sort are insufficient to create a disputed issue of material fact. *Thompson,* 312 F.3d at 649.

The excerpt from the deposition of William D. Harvey is no more helpful to plaintiff's cause. Mr. Harvey, who has worked at NASA, AS & M, and Tao (Pl.'s Mem. in Supp.App. at 101), testified in the cited excerpt regarding Tao's difficulties obtaining research and development contracts from NASA. The cited pages contain the following exchanges:

Q: Okay. Do you know why Tao was unable to win very many R & D contracts from NASA or DOD?

A: I don't know exactly why. Just they were not selecting.

. . . . .

Q: Do you know what this something is that was supposedly blocking your ability to get contracts with NASA?

A: I do not.

Q: Today you do not know?

A: No.

(*Id.* at 1433–34.)

At one point, Mr. Harvey suggested that an unidentified person or persons at NASA told him that Tao's proposals were rejected because Tao's techniques had not been demonstrated or validated. (*Id.* at 1435–36.) At no point does Mr. Harvey indicate that he has any first-hand knowledge demonstrating or suggesting that misrepresentations from AS & M were responsible for any drought of NASA contracts that Tao may have experienced. As such, plaintiff has failed to set forth specific facts to illustrate a genuine issue regarding whether AS & M's alleged false advertising caused harm to plaintiff.

### b. Benefit to Defendants

█ Although plaintiff presents some evidence in support of its claim that AS &

M benefited from the alleged false advertising, that evidence is too speculative and attenuated to create a triable issue of fact. Plaintiff's case relies on inferentially linking three sources: (1) official NASA documents governing the ETS procurement (Pl.'s Mem. in Opp.App. 748–53, 985–86); (2) the expert report of Richard J. Wall, a former government procurement official with more than thirty years of experience in federal acquisitions (*id.* at 1273–1303) ("the Wall Report"); and (3) the deposition testimony of Dr. Ndaona Chokani, an expert in aerodynamics (Pl.'s Mem. In Opp. App. 1418–19).

The Request for Proposals for the 1995 ETS contract states two evaluation factors for selecting the winning proposal: (1) a "Mission Suitability" factor, which is weighted and scored, and (2) a cost or price factor, which is not weighted or scored. (*Id.* at 979.) Although a decision must be based on "an integrated assessment of both factors," Mission Suitability "is of greater importance." (*Id.* at 985.)

The Mission Suitability factor is divided into three subfactors, each of which is divided into smaller categories referred to as "elements." (*Id.*) The element called "Technical Understanding" is worth 225 points, or 22.5% of the 1000 total Mission Suitability points. (*Id.*) The Technical Understanding element is intended "to evaluate the offeror's overall understanding of the requirements of the SOW [Statement of Work] as demonstrated by the appropriateness of the offeror's technical approach, completeness, overall balance of the proposal, and the offer's cost realism." (*Id.* at 980.)

Proposals are evaluated by a Source Evaluation Board, which makes a recommendation to the Source Selection Official, who renders a final decision. The report of the Source Selection Official for the 1995 ETS contract states that AS & M's proposal "had the highest mission suitability score with the lowest price." (*Id.* at 752.) The Source Selection Official's report further indicates that Advanced Engineering and Research Associates, Inc. ("AERA") had the second-highest Mission Suitability score, and that AERA's score "was approximately 19% lower than" AS & M's score. (*Id.* at 751.)

The Wall Report concludes that AS & M won the 1995 ETS contract "because of superior mission suitability, as represented in AS & M's proposal." (*Id.* at 1274.) The Wall Report maintains that "[a]lthough ASM offered the lowest probable cost ... it is doubtful that this had a determinative effect on the outcome of the award decision." (*Id.* at 1287.) The report bases this conclusion on its observation that "[t]hree other competitors offered pricing near ASM's," but all three had lower mission suitability scores. (*Id.*) The report opines that "only [AERA] was competitive with ASM in the mission suitability area," and that "[g]iven that the probable cost rankings of ASM and AERA were roughly equivalent, the differentiator between ASM and AERA, in my view, had to be the mission suitability evaluation." (*Id.* at 1283.)

Dr. Ndaona Chokhani testified regarding his opinion of the 1995 ETS proposal. (*Id.* at 1415–19.) Dr. Chokhani stated that, upon review of the 1995 ETS proposal, the only innovative technologies that he could identify in his field of expertise, aerodynamics, were those belonging to plaintiff. (*Id.* at 1418–19.) Although Dr. Chokhani did not notice any innovative technologies in other fields mentioned in the proposal, he admitted that "there may be experts in that field who noticed these things." (*Id.* at 1419.) The excerpt of Dr. Chokhani's testimony cited does not address the presence or absence of non-innovative technologies.

As already discussed, plaintiff must produce evidence from which a jury could reasonably find that AS & M's allegedly false representations caused AS & M to win the 1995 ETS contract. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. The evidence presented here, however, is too attenuated and speculative to support a finding of causation.

Viewing the facts in the light most favorable to the nonmoving party, the court accepts plaintiff's starting premise that the 1995 ETS proposal contained references to innovative aerodynamics technologies which belonged to Tao, an assertion which is supported by the Chokhani deposition. Any references to Tao's aerodynamics technologies, however, make up only some part, unspecified by plaintiff's evidence, of "the appropriateness of the offeror's technical approach" to the Request for Proposals. In turn, the appropriateness of the offeror's technical approach makes up only some part, unspecified by plaintiff's evidence, of the Technical Understanding element. The Technical Understanding element makes up only 22.5% of the Mission Suitability factor. Finally, the Mission Suitability factor is only one of two factors making up the final contract decision, albeit the more important of the two.[5] To move from the starting premise, that the 1995 ETS proposal contains references to Tao's innovative aerodynamics technologies, to the necessary endpoint, that such references caused AS & M to win the 1995 ETS contract, requires the repeated piling of one inference upon another. A genuine issue of material fact cannot be manufactured in this fashion. Plaintiff's evidence of causation reduces to mere speculation.[6]

In a search for more direct corroboration of its claim, plaintiff cites generally to the Wall Report for the premise that "Wall concluded that AS & M won the ETS Contract based upon superior technical capabilities, not its management plan or lower costs." (Pl.'s Mem. in Supp. at 20–21.) In fact, however, the Wall Report states in its "Summary of Conclusions" section that "ASM won the Dryden contract because of superior mission suitability, as represented in ASM's proposal." (*Id.* App. at 1274.) The Summary of Conclusions makes no reference to AS & M's technical capabilities or management plan. (*Id.*)

One page of the report, uncited by plaintiff, does state the opinions that "AS & M's technical capabilities, as represented in AS & M's proposal, were determinative in the award of the Dryden successor contract," and that "[t]hese capabilities were key discriminators in the award of both the Dryden contract and the Dryden successor contract," rather than cost.[7] (*Id.* at 1290.) When questioned about this use of the term "technical capabilities" at his deposition, however, Mr. Wall explained the following:

> By way of shorthand, all proposals are evaluated in terms of the technical capability or technical solution that's being offered and then the financial aspects of

---

**5.** The Wall Report helps plaintiff somewhat on this point, opining that it is "doubtful that [cost] had a determinative effect on the outcome of the award decision." (Pl.'s Mem. in Opp.App. at 1287.)

**6.** Because AERA, AS & M's only close competitor for the contract, had a Mission Suitability score approximately nineteen percent lower than AS & M's score (Pl.'s Mem. in Opp.App. at 1283), any alleged misrepresentations could have "caused" AS & M to win the contract only if those misrepresentations substantially enhanced AS & M's score. If, instead, the alleged misrepresentations only boosted AS & M's Mission Suitability score by a trivial amount, any such misrepresentations could not have "caused" AS & M to win a contract that it would have won otherwise.

**7.** The Wall Report's discussion on this point, like its Summary of Conclusions, makes no mention of management plan. (Pl.'s Mem. in Opp.App. at 1290.)

it, the costs, the cost in pricing data and the offeror that relates to that. . . .

[S]o in the jargon of government contracts, and that's where I was using the phrase from, there is a technical evaluation and a pricing evaluation, and what I'm saying is that the technical evaluation is what won it for the winning offeror.

(Defs.' Reply Ex. 33, at 12.) Placed in this context, and in the context of the full Wall Report, it is clear that this reference to "technical capabilities" was meant only to refer again to Mission Suitability, consistent with that report's Summary of Conclusions.

Plaintiff's claim that alleged misrepresentations made in a 2001 proposal to NASA caused benefit to AS & M is unavailing for the same reasons: the evidence presented is too attenuated to amount to more than mere speculation. In regard to any other alleged misrepresentations, the cited record is devoid of evidence that they resulted in benefit to AS & M. Because plaintiff has not met its burden of producing evidence sufficient to establish a "causal link" between AS & M's actions and any alleged harm to Tao, or benefit to AS & M, plaintiff has no sustainable claim under the Lanham Act, and defendants' motion for summary judgment is **GRANTED**. *See Xoom, Inc.*, 323 F.3d at 286.

**2. Count Three: Trade Secret Misappropriation**

█ The Virginia Uniform Trade Secrets Act provides a cause of action for misappropriation of a trade secret. Va. Code Ann. § 59.1–338 (Michie 2001). Absolute secrecy is not required to qualify for protection; the owner of a trade secret may disclose it to a licensee, an employee, or a stranger, if the disclosure is made in confidence, express or implied. *Dionne v. Southeast Foam Converting & Packaging,*

*Inc.,* 240 Va. 297, 397 S.E.2d 110, 113 (1990).

Under VUTSA, a number of acts can constitute misappropriation, including disclosure or use of a trade secret without consent by a person who, at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was either (1) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (2) derived from or through a person who owed a duty to maintain its secrecy or limit its use. Va.Code Ann. § 59.1–336. Mere acquisition of a trade secret can also be an act of misappropriation if the acquirer "knows or has reason to know" that the secret was acquired by improper means. *Id.*

An employer can be held vicariously liable for trade secret misappropriation committed by an employee acting within the scope of his employment. *Newport News Indus. v. Dynamic Testing,* 130 F.Supp.2d 745, 754 (E.D.Va.2001). Generally, a former employee has a duty not to reveal confidential information obtained through his employment, and not to use such confidential information after he has left his employment. *Bull v. Logetronics, Inc.,* 323 F.Supp. 115, 133 (E.D.Va.1971).

Plaintiff has alleged that Dr. Venki, a former Tao employee, took flutter test results from plaintiff and provided them to AS & M in contravention of his duty to preserve the confidentiality of information obtained through his employment. Moreover, plaintiff has supported its allegations with record evidence. Plaintiff has provided evidence that (1) at the time that Dr. Venki worked on the flutter test project, he was an employee of plaintiff (Pl.'s Mem. in Opp.App. at 1574); (2) Tao employees were instructed that they were to treat the flutter test results as confidential (*id.* at 1439), and Dr. Venki was himself aware that the results were to be treated as confidential (*id.* at 139); and (3) Dr. Venki

provided flutter test results to AS & M (*id.* at 1447, 1580). Plaintiff has further provided evidence, disputed by defendants, that AS & M disclosed or used the test results in proposals and presentations to NASA.

Defendants move for summary judgment on three bases: first, by offering an alternate version of these events; second, by arguing that they cannot have "disclosed" the flutter test results to NASA, a party with a right to those results; and third, by arguing that any disclosure or use of the flutter test results was done with the express or implied consent of NASA.

The first argument is easily rejected. Plaintiff has properly supported its version of events, and presented evidence to controvert defendants' version. As the material facts are fairly disputed, summary judgment on this basis would be inappropriate.

Defendants' second argument is at best partly persuasive. Defendants cite to the Memorandum of Agreement between NASA's Langley Research Center and Tao, which states that "both parties shall have equal rights to the data collected pursuant to this [agreement]." (Pl.'s Mem. in Opp.App. at 135.)[8] Defendants argue that they cannot have "disclosed" flutter test results to NASA, a party with a legal right to those results.

This point is not entirely without persuasive force: "disclosure" is generally understood as "[t]he act or process of making known something that was previously unknown." *Black's Law Dictionary* 497 (Bryan A. Garner ed., 8th ed.2004). If NASA already had the flutter test results, it could well be argued ·that AS & M did not "disclose" those results to NASA. While defendant's argument, if accepted by the court, would negate a claim that AS & M·had misappropriated the flutter test results by "disclosing" them, it would not address claims that AS & M had misappropriated the results by "using" them in proposals or presentations, or that the various defendants had improperly "acquired" the results. Thus, defendants' argument fails to addresses two of the three acts which can constitute VUTSA misappropriation.

Defendants' third argument is likewise unavailing. Defendants claim they cannot have committed misappropriation because they acted with the consent of NASA, a party with rights in the flutter test results, and VUTSA only prohibits the "[d]isclosure or use of a trade secret of another without express or implied consent," Va. Code Ann. § 59.1–336. Although it is undisputed that AS & M's ETS proposal was made in response to a NASA request for proposals, defendants have presented no evidence or argument for construing NASA's request for proposals as express or implied consent to use the flutter test results. Additionally, this argument, like defendants' second argument, fails to address possible misappropriation through improper acquisition.

Because the material facts concerning trade secret misappropriation are fairly disputed by plaintiff's evidence, the motion for summary judgment on Count Three is DENIED.

**B. Counterclaim Defendants' Motion for Summary Judgement**

■ As already discussed, the acts necessary to constitute misappropriation un-

---

8. Although plaintiff asserts that the Memorandum in Agreement makes the data resulting from the flutter testing "proprietary to Tao," the record belies this claim. The Memorandum actually states that "[d]ata *provided by* Tao Systems will be considered proprietary to Tao Systems," but that "both parties shall have equal rights to all *data collected.*" (Pl.'s Mem. in Opp.App. at 135 (emphasis added).)

der the Virginia Uniform Trade Secrets Act vary with the acquirer's knowledge at the time of acquisition. If the acquirer "knows or has reason to know that the trade secret was acquired by improper means," mere acquisition of a trade secret is sufficient. Va.Code § 59.1–336. If, instead, the acquirer does not know or have reason to know that the trade secret was acquired by improper means, acquisition alone is not sufficient, and the acquirer must disclose or use the trade secret to have committed misappropriation within the meaning of the statute. *Id.*

VUTSA defines a trade secret as "information" that (1) derives independent economic value from not being generally known, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Va.Code § 59.1–336. A written document is not information, but rather a vehicle for expressing information. Thus, a document itself cannot be a trade secret, although it may contain trade secrets. *See Tao,* 299 F.Supp.2d at 577 ("[I]t is reasonable to infer that the ETS Proposal contains trade secrets other than those which may belong to Tao."). Counterclaim plaintiff AS & M seeks to impose VUTSA liability on counterclaim defendants Tao and Dr. Mangalam. AS & M claims that Tao and Dr. Mangalam misappropriated AS & M trade secrets from a 1995 AS & M proposal to NASA. For liability to attach under VUTSA, the counterclaim defendants must have committed either of two actions: (1) acquired the proposal, which contains trade secrets, while knowing or having reason to know that it was obtained by improper means, or (2) disclosed or used a trade secret contained in the proposal.

It is undisputed that counterclaim defendants acquired a copy of AS & M's 1995 ETS proposal. More specifically, it is undisputed that counterclaim defendants received the 1995 ETS proposal from Walter Kalman ("Kalman"), the operator of Kalman & Co., an engineering support services company in the Norfolk area.[9]

Kalman represents that he obtained the proposal through proper means; namely, through a FOIA request. AS & M has marshaled record evidence sufficient to create an issue as to whether Kalman did in fact obtain the proposal through a FOIA request. There is no dispute, however, that Kalman had told counterclaim defendants that he had received the proposal through FOIA. Both Kalman and Dr. Mangalam have testified to this effect (Countercl. Defs.' Mem. in Support App. at 3–4, 14), and AS & M has not pointed the court to any record evidence to dispute the content of their conversation. Nor has AS & M pointed the court to any evidence that counterclaim defendants would have known or had reason to know that Kalman had obtained the proposal through improper means, rather than through the purported FOIA request. Because there is no evidence to suggest that counterclaim defendants knew or should have known that the proposal was acquired through improper means, their mere acquisition of the proposal cannot constitute the misappropriation of a trade secret.

■ Accordingly, counterclaim defendants can only be liable under VUTSA if they disclosed or used a trade secret from the ETS proposal. AS & M points the court to only one portion of the 1995 proposal which has allegedly been disclosed or

**9.** Although AS & M suggests that "Kalman is not the only potential source of the Proposal," (Countercl. Pl.'s Brief in Opp. at 7), AS & M has not come forward with any evidence to affirmatively set forth a different version of

events, or to contradict the evidence propounded by counterclaim defendants. AS & M's mere speculation that events were otherwise is insufficient to create a genuine factual dispute on this point.

used by counterclaim defendants: a header titled "Technical Understanding and Approach." AS & M claims that counterclaim defendants copied the header from AS & M's proposal and used it in preparing their own draft proposal language. Accepting as true that counterclaim defendants did indeed copy the header language, such an action cannot constitute trade secret misappropriation, as the header "Technical Understanding and Approach" is plainly not a trade secret. Although it may be a useful turn of phrase, it is not information that derives independent economic value from not being generally known. Thus, AS & M has made no showing that counterclaim defendants disclosed or used any trade secret from the 1995 proposal.

Because the undisputed facts reflect that counterclaim defendants are entitled to judgment as a matter of law, their motion for summary judgment is **GRANTED**.

### C. Plaintiff's Motion to Amend the Complaint

Plaintiff Tao seeks to amend its complaint to add four new counts under Virginia law: Count Five, fraud in the inducement; Count Six, fraud; Count Seven, breach of contract; and Count Eight, breach of fiduciary duty. All four claims are based in the events and agreements surrounding Dr. Mangalam's departure from AS & M in the spring of 1994.

Because all federal claims have been eliminated from this case, the court declines to exercise supplemental jurisdiction over Count Three, the sole remaining claim. *See* 28 U.S.C. § 1367(c)(3). Accordingly, the Count Three claim of trade secret misappropriation is **DISMISSED WITHOUT PREJUDICE** to plaintiff's right to pursue it in state court. Plaintiff's motion to amend the complaint to add new

state law claims is therefore **DENIED** as moot.[10]

### IV. Conclusion

For the reasons stated above, the court **GRANTS** defendants' motion for summary judgment on Count Two, **DENIES** defendants' motion for summary judgment on Count Three, and **GRANTS** counterclaim defendants' motion for summary judgment on the counterclaim. The court declines to exercise supplemental jurisdiction over Count Three, pursuant to 28 U.S.C. § 1367(c), and Count Three is **DISMISSED WITHOUT PREJUDICE**. Plaintiff's motion to amend the complaint to add new state law claims is **DENIED** as moot. Any other motions pending in this case, ripe or unripe, are similarly rendered **MOOT** by this Opinion and Final Order. The Clerk is **DIRECTED** to forward a copy of this Opinion and Final Order to all parties and to enter final judgment in this court pursuant to this opinion.

**IT IS SO ORDERED.**

10. Plaintiff also may pursue these claims in state court, if it so chooses.