Charles T. WILDER, Jr., Plaintiff,

v.

SOUTHEASTERN PUBLIC SERVICE AUTHORITY,

and

Toney Saunders, Superintendent of Transportation, Defendants.

Civ. A. No. 2:94CV531.

United States District Court, E.D. Virginia, Norfolk Division.

Dec. 6, 1994.

SuAnne Leigh Hardee, Chesapeake, VA, for plaintiff.

William M. Furr, William E. Rachels, Jr., Willcox & Savage, Norfolk, VA, for Southeastern Public Service Authority and Tony Saunders.

## MEMORANDUM ORDER

CLARKE, District Judge.

This matter comes before the Court on the Defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, Summary Judgment is **GRANTED**.

**BACKGROUND:**

Charles T. Wilder ("Wilder" or the "Plaintiff") was employed by the Southeastern Public Service Authority (the "SPSA"), a political subdivision created by Virginia statute, as a dispatcher clerk from May 29, 1990 until his resignation on May 19, 1993. Wilder is an African–American and suffers from Crohn's Disease, a condition characterized by the chronic inflammation of the bowels. Toney Saunders ("Saunders") is a Transportation Superintendent at the SPSA and was at all times Wilder's immediate supervisor. Saunders is also African–American.

Irvin Gentry ("Gentry") is Saunders' direct supervisor. Richard Hains ("Hains") and Carl Brooks ("Brooks") are previous SPSA employees. Hains was fired for making inappropriate racial remarks which were heard by Brooks. Brooks is now suing the SPSA in an unrelated case.

On February 9, 1993 Wilder filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging disability discrimination. Specifically, Wilder complained that Saunders improperly issued him both a written warning and a two day suspension. Saunders contends both disciplin-ary actions were justified: the written warning was issued on October 9, 1992 because Wilder failed to attend a required training session; the suspension was handed down on January 13, 1993 because Wilder failed to call in and report that he would be missing work. On September 9, 1993 Wilder filed another complaint with the EEOC. The latter complaint alleged both racial and disability discrimination. Curiously, while Wilder raised other issues, he did not question the fairness of the SPSA disciplinary actions either in his brief or at argument before the Court.

Wilder was assigned to the Suffolk Landfill, where he was the only full-time dispatch clerk. A dispatch clerk is required to inform the trucks leaving the landfill of their destination. The dispatcher's position needs to be staffed during all working hours. Consequently, when Wilder was absent, Saunders was forced to reassign another SPSA employee to fill the job. In the thirty-six months Wilder worked at the SPSA, he took 750 hours of authorized leave. Of those hours, 280 were paid annual leave; the balance was either paid sick leave or unpaid leave.

Saunders claims Wilder was never disciplined for absences attributable to his disease; however, he was disciplined for failing to follow SPSA procedure in requesting leave and for absences unrelated to his disease. The SPSA records indicate the following disciplinary actions against Wilder: one verbal warning; one written warning; and a total of three days suspension time. Wilder resigned just prior to a "Group III Corrective Advice Report conference," which was being held due to Wilder's accumulation of corrective reports during the previous six months.

**ANALYSIS:**

Summary judgment is appropriate where the pleadings, depositions and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c). To avoid summary judgment, the non-moving party must introduce evidence to create an issue of material fact on "an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■ Plaintiff's race discrimination claims are brought under various provisions of federal civil rights legislation. *See* 42 U.S.C.A. § 2000e *et seq.* (1981 & Supp.1994) ("Title VII"); 42 U.S.C.A. § 1981 (1984); 42 U.S.C.A. § 1983 (1994). His disability claim is brought under the Americans with Disabilities Act ("ADA") 42 U.S.C.A. § 12101 *et seq.* (1994). To prevail, Wilder is required to prove intentional discrimination. *See General Bldg. Contractors Assoc., Inc. v. Pennsylvania,* 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982).

## A. INTENTIONAL RACE DISCRIMINATION

### I. The Prima Facie Case:

■ Wilder presents no direct evidence of discrimination. Accordingly, he has the initial burden of proving a *prima facie* case. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The *prima facie* case consists of the following elements: (1) plaintiff is a member of a protected class; (2) plaintiff was qualified for the job and performed the job satisfactorily; and (3) plaintiff suffered some adverse employment action.[1] *See Carter v. Ball,* 33 F.3d 450, 459 (4th Cir.1994). The *McDonnell Douglas* analysis is also applicable to plaintiff's employment discrimination claims under § 1981 and § 1983. *See Oliver v. Digital Equip. Corp.,* 846 F.2d 103 (1st Cir.1988) (§ 1981); *St. Mary's Honor Ctr. v. Hicks,* ── U.S. ──, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (§ 1983).

■ Once established, the *prima facie* case creates a presumption of discriminatory conduct; however, that presumption can be rebutted with evidence of the employer's legitimate nondiscriminatory reasons for the adverse employment decision. *Carter,* 33 F.3d at 459. The burden of proof then shifts

back to the plaintiff to demonstrate that the proffered reasons are pretextual. *Id.*

### A. *Wilder is a member of two protected classes:*

As to the first element, it is undisputed that Wilder is a member of two separate classes protected under federal law; he is a disabled African American.

### B. *Wilder did not perform his job satisfactorily:*

■ As to the second element, Plaintiff must show that he was qualified for the job and performed the job in a satisfactory manner. The SPSA maintains that Wilder was not a satisfactory employee, and candidly admits that it wished to terminate him. The SPSA's dissatisfaction was rooted in the fact that Wilder's frequent absences were incompatible with the nature of his job. That is, his absences were particularly problematic because he was the only full-time dispatcher clerk at the Suffolk landfill.

Again, we note that before this Court Wilder does not contest either the SPSA's calculation of Wilder's absences or the fairness of the various SPSA disciplinary procedures. In particular, Wilder does not disagree that, so long as he followed proper SPSA procedures, he was never disciplined for missing work due to his medical condition. Thus, given the requirements of the dispatcher position, the excessive number of hours which Plaintiff was required to miss because of his disease, and Wilder's numerous unexcused absences, we find that Wilder was not a satisfactory employee. *See Tyndall v. National Educ. Ctrs.,* 31 F.3d 209, 213 (4th Cir.1994).

### C. *Because Wilder resigned from the SPSA, he has suffered no adverse employment action:*

However, even assuming that Wilder was a satisfactory employee, his race discrimination claims would still fail because he has suffered

---

1. The *McDonnell Douglas* prima facie case traditionally contains a fourth factor; whether the position remained open to other qualified applicants after plaintiff's dismissal. However, because Wilder quit his job at the SPSA and now claims to be permanently disabled, that inquiry is inapplicable to the facts of this case. *See McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13 (the prima facie case must be adapted to differing factual situations).

no adverse employment action. The third element of the *prima facie* case requires that the plaintiff demonstrate he suffered some adverse employment action. *Carter,* 33 F.3d at 459. In this case, Wilder, who resigned his job at the SPSA, alleges constructive discharge and a racially hostile work environment. However, Wilder's own testimony indicates his resignation was attributable only to his failing health.

### 1. *Wilder Was Not Constructively Discharged Based On His Race.*

The doctrine of constructive discharge protects an employee from a deliberate and calculated effort to pressure him into resignation through the imposition of unreasonably harsh working conditions. *Id.* (citing *Bristow v. Daily Press Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986)). Accordingly, as incorporated in a race discrimination case, a claim of constructive discharge requires proof of two elements: the specific intent of the employer to force the employee to leave because of racially discriminatory reasons and the objective intolerability of the employee's working conditions. *See Bristow,* 770 F.2d at 1255. The intent requirement in a constructive discharge claim can be inferred through circumstantial evidence. *Id.*

a. *The SPSA did not specifically intend to force Wilder to resign by discriminating against him on the basis of race.* On this element, Plaintiff's own deposition testimony is his greatest obstacle; the following colloquy is particularly instructive:

Q. ... First of all, did Toney Saunders discriminate against you because you are black?

A. I don't think it had to do with my race. I think it had to do with me just as a person.

   .    .    .    .    .

Q. ... Are you suggesting that Toney Saunders or anybody above him had any racially motivated reason to discriminate against you? ... What I'm asking you is whether you have any reason to believe that Mr. Saunders,

Mr. Gentry, Mr. Forehand, Mr. Curling, anybody above Toney Saunders had any racially discriminatory reason to discriminate against you or to fire you?

A. Racially?

Q. Right.

A. Not that I know of.

By its own terms, the Plaintiff's sworn testimony rebuts the gravamen of his race claim. Wilder admits that neither Saunders, who is African–American, nor *any of the supervisory personnel* at the SPSA discriminated against him because of his race.

To mitigate the force of his admission, Wilder later submitted an affidavit which stated:

During my depositions, any failure on my part to mention as bases of my suit race or disability was due to the fact that I felt it was unnecessary to specifically mention race or disability as I had previously alleged in my lawsuit that such were the reasons I was discriminated against.

However, given the pointed phrasing of the questions propounded to Wilder, the Court finds this explanation unpersuasive. The Plaintiff cannot create a genuine issue of material fact by offering an affidavit squarely at odds with his own previous sworn deposition testimony. *Barwick v. Celotex Corp.,* 736 F.2d 946, 959 (4th Cir.1984) (citing *Radobenko v. Automated Equipment Co.,* 520 F.2d 540, 544 (9th Cir.1975)).

Plaintiff's testimony also indicates that his resignation was voluntary and not the product of a constructive discharge:

Q. But it was a voluntary departure from SPSA?

A. Yes, because I was no longer able to work anymore. So I resigned because of health reasons, not because of any other reasons.

   .    .    .    .    .

Q. O.K. My question to you is, the fact that these constructive advice reports had been issued, did that have any effect whatsoever on your decision to leave SPSA—

A. No.

Q. —to retire or resign.

A. No.

Q. O.K.

A. My health did.

Q. O.K.

A. Strictly my health.

In sum, Plaintiff's own testimony establishes that: 1) Wilder had no reason to believe that he was discriminated against because of his race; and 2) Wilder's resignation was voluntary and not traceable to disciplinary action from the SPSA.

■ b. *Working conditions at the SPSA were not intolerable for Wilder from an objective standpoint.* The Plaintiff has also failed to meet the second *Bristow* prong; that his working conditions were "objectively intolerable." In other words, "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 361 (2d Cir.1993) (*citations omitted*).

Plaintiff contends that, in an effort to harass Wilder, Saunders instructed Hains to "supervise" Wilder although Saunders knew that Hains and Wilder had a hostile relationship.[2] Hains was not technically Wilder's supervisor, and Hains did not directly evaluate Wilder's job performance. However, Hains made what appear to be informal reports to Saunders regarding Wilder's job performance.

According to Wilder, Hains took a personal interest in making sure Wilder complied with SPSA procedure. For example, Hains (although not on duty) would call in to work to check up on Wilder or to see that Wilder had arrived on time. Also, Hains would have his wife, Ella, scrutinize Wilder's actions on the job.

■ In *Clowes v. Allegheny Valley Hosp.*, the Third Circuit observed that hypercritical supervision fell well short of permitting an inference of constructive dis-

charge. 991 F.2d 1159, 1161 (3d Cir.1993). Similarly, while Hains' conduct may have been intrusive and overbearing, the Court does not find Wilder's situation at the SPSA to be objectively intolerable. In fact, the evidence shows that Hains did little more to Wilder than ensure that Wilder followed the company rules. While certainly irksome, the job related snooping of a co-worker—even at the behest of a supervisor—does not rise to the level of a constructive discharge. The constructive discharge doctrine cannot be turned into a "palliative for every workplace grievance." *Bristow*, 770 F.2d at 1255.

Furthermore, the evidence shows that some degree of monitoring was necessary because of the office situation at the SPSA; as Hains explained:

> In other words—see, we worked out of two offices. I worked out of my office. Mine was the inner office. Then we had a dispatcher's office. I was to monitor [Wilder]. In other words, if he didn't show up at ten o'clock or eleven o'clock when we started dispatching, I was to inform Toney so he could make arrangements to have somebody come in to do [Wilder's] job so I could get out of that office to go back to my office to do my job.

Lastly, we note that Wilder resigned after Hains was fired. This fact militates against a finding that Hains made work intolerable for Wilder. Thus, because Wilder has failed to meet the *Bristow* criteria, his claim of constructive discharge must fail.

2. *There Is No Evidence Of A Racially Hostile Work Environment At The SPSA.*

■ Plaintiff next offers the deposition testimony of Carl Brooks, a former SPSA employee who is also suing the SPSA. Brooks provides no evidence of discrimination—racial or otherwise—against the Plaintiff individually. Instead, Plaintiff advances the Brooks' testimony to demonstrate a "racially discriminative attitude" which is allegedly held by the SPSA "hiring authorities."

---

**2.** This hostility stemmed from an incident where Ella Hains, Richard Hains' wife and also an SPSA employee, filed a sexual harassment

charge against Wilder with the SPSA. The charge was later dropped.

In fact, the evidence pertains to only one SPSA supervisor, Gentry.

■ a. *The statements of Hains and Brooks do not establish a racially hostile work environment.* Plaintiff points to *EEOC v. Beverage Canners, Inc.* as establishing that discriminatory motive may be proved by *direct evidence* of the racially discriminatory attitudes held by the hiring authorities, regardless of whether it relates to the employment decision at issue. 897 F.2d 1067, 1071 n. 9 (11th Cir.1990) (*emphasis added* ). A racially hostile work environment must be sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere. *Carter,* 33 F.3d at 461. This standard requires both an objectively hostile work environment as well as Wilder's subjective perception that the environment is abusive. *See Harris v. Forklift Systems Inc.,* —— U.S. ——, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

In the instant case, we find Wilder's proffered evidence inadmissible to oppose a summary judgment motion. Further, even if the statements in question were admissible, we find they do not constitute direct evidence of discrimination and are insufficient to alter Wilder's conditions of employment from an objective standpoint.

■ Brooks testified during deposition that "Gentry hates Blacks." Brooks bases this conclusion on the following *single* statement: "[Gentry] knows how to control the niggers." This statement was made by Hains to Brooks; as such it is hearsay[3] not within any exception and therefore inadmissible to oppose a summary judgment motion under Federal Rule of Civil Procedure 56(e). *Maryland Highway Contractors Ass'n v. Maryland,* 933 F.2d 1246, 1251 (4th Cir.), *cert. denied,* 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 325 (1991).

Furthermore, even if it were not hearsay, Hains' statement is not "direct evidence" of discrimination because it merely expresses an employee's opinion about a supervisor; it is not an admission by Gentry himself which the Court could then attribute to the SPSA. *See Holsey v. Armour & Co.,* 743 F.2d 199,

214 (4th Cir.1984), *cert. denied,* 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985) (manager's statement to employee that blacks are not hired as sales managers constitutes direct evidence of discrimination). And, the record does not even provide the factual basis for Hains' statement. Thus such evidence is insufficient for this Court to infer that discrimination was a pervasive, regular practice at the SPSA.

■ As for Brooks' statement, Brooks has no personal knowledge regarding Gentry's putative prejudices; his opinion appears to be exclusively derived from Hains' statement. Thus Brooks' conclusion that Gentry hates Blacks is inadmissible as well. *Id.;* Fed.R.Civ.P. 56(e). In fact, there is no evidence whatsoever that Gentry actually harbors any racial animosity; the entire record is void of any actions by Gentry or concerning Gentry which would lend support to Brooks' conclusion. Thus we find that Brooks' naked allegation against Gentry, which is grounded in inadmissible hearsay, made without personal knowledge, and has been raised at the eleventh hour, does not create a triable issue of material fact.

b. *Brooks' testimony does not establish that the SPSA's desire to fire Wilder was illegally motivated.* Plaintiff also suggests that certain supervisors at the SPSA, including Saunders and Gentry, hatched a scheme to rid themselves of Wilder. Of course, the mere intent to fire Wilder is not illegal; rather, Plaintiff must show that such intent was motivated by an illegal reason such as race or disability. However, Brooks' testimony—upon which the Plaintiff relies exclusively—does not establish such a claim:

Q. O.K. So you had the information through Hains that Gentry wanted to get rid of Wilder because he was black or because he had a disability or just because he was Wilder?

A. He was a troublemaker, according to them.

. . . .

Q. Did Mr. Saunders say he had to get rid of Mr. Wilder because he's black?

---

**3.** *See* Fed.R.Evid. 801(c).

A. He said that—he said—he said he was a troublemaker.

The Brooks testimony shows that Saunders and Gentry wanted to fire Wilder because Wilder was a "troublemaker." Counsel for the Defendants admitted this much at oral argument. Indeed, it is undisputed that the SPSA was displeased with Wilder's job performance. However, despite the suggestive questions asked of Brooks, he does not attribute any illegal motive to the SPSA.

### D. Wilder provides no evidence that discrimination was "customary" at the SPSA:

■ As mentioned above, the *McDonnell Douglas* prima facie case is applicable to both § 1981 and § 1983 claims as well. Thus Wilder's failure to meet his *McDonnell Douglas* burden will result in a dismissal of not only his Title VII claim, but his constitutional claims as well. However, with respect to Wilder's § 1981 and § 1983 claims, we find it prudent to discuss an alternative ground for our decision.

■ In *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that a municipality is a "person" for purposes of § 1983 and therefore is amenable to suit. However, the scope of that liability was circumscribed: it is only when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983. *Id.* at 694, 98 S.Ct. at 2037. A similar rationale applies to suits brought under § 1981. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989).

■ In this case, Wilder make various constitutional claims against the SPSA. But, Wilder has failed to put forward any evidence of "custom or policy" discrimination (either race or disability) by the SPSA. Instead, Plaintiff merely argues that the SPSA

"ratified" the actions of Saunders and Hains. However, because a municipality cannot be held liable under § 1983 on a *respondeat superior* theory, *Monell*, 436 U.S. at 690–91, 98 S.Ct. at 2035–37, Plaintiff's bare allegation is insufficient to meet the *Monell* standard.

### II. Summary:

Accordingly, we find that Wilder has failed to establish a *prima facie* case of race based discrimination. In addition, he has failed to prove that the SPSA engaged in discriminatory practices as a matter of custom or policy. His various claims under Title VII, § 1981 and § 1983 must therefore be **DISMISSED.**

### B. INTENTIONAL DISABILITY DISCRIMINATION

■ The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual...." 42 U.S.C.A. § 12112(a). It is undisputed that the SPSA is a "covered entity" and that Wilder's Crohn's Disease constitutes a disability. Therefore, in order to prevail under the ADA, Wilder must prove that he was discriminated against because of his disability and that he is otherwise qualified for the job. *See Tyndall*, 31 F.3d at 213.

■ Once again, Plaintiff's case is seriously undermined by his own deposition testimony. We observe that Plaintiff's explanation, quoted above, of why he quit his job is relevant to the ADA claim. Wilder admitted to quitting "strictly" because of his poor health. He does not even mention discrimination as being a factor. Second, when given ample opportunity at deposition to describe Saunders' putative discriminatory practices, Plaintiff failed to provide even a single concrete example.

At page 295 of his deposition, Wilder does allege disability discrimination by Saunders. However, Plaintiff does not go much beyond this bare allegation.[4] The most we can make

---

4. Counsel for Plaintiff does not devote much argument to this rather crucial point. Thus the Court is left to interpret the various deposition

excerpts submitted by the parties. At page 301 Wilder initially says that Saunders discriminated against him by scheduling him for too many

of this claim is that Saunders did not go out of his way to accommodate Wilder's scheduling desires. That is, Wilder believed that Saunders failed to make "allowances." However, Wilder does not indicate what type of accommodations should have been made; he does not even testify as to requesting any such allowances.

Furthermore, the unrefuted evidence before the Court indicates that Wilder was never disciplined for being late or absent when attributable to medical reasons, so long as proper SPSA procedure was followed. In light of this fact, and given the paucity of specific evidence put forward by Wilder, we cannot say Wilder was discriminated against by Saunders, much less any of his other supervisors at the SPSA.

■ Even if Wilder had been discriminated against by the SPSA, his ADA claim would still fail because he is not otherwise "qualified" for the position. A qualified individual is,

> an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position such individual holds or desires.

42 U.S.C.A. § 12111(8). In *Tyndall,* the Fourth Circuit held that, because a regular and reliable level of attendance is a necessary element of most jobs, an employee's excessive absences can render him unqualified for certain employment. 31 F.3d at 213. Here, Wilder, who was employed by the SPSA for about thirty-six months, was absent from work for more than four months. Indeed, Plaintiff does not even dispute that, under the holding in *Tyndall,* Wilder would not be a qualified employee.

Instead, Plaintiff claims that the SPSA cannot rely on *Tyndall* because "it was [the SPSA's] treatment of the Plaintiff that caused the absenteeism which they assert as the reason for his disqualification." However, a number of Wilder's absences were attributable to non-medical reasons. Certainly these were not caused by the SPSA. More importantly, Wilder provides absolutely no evidence of this alleged causal link. That is, there is nothing in the record which ties Wilder's flare-ups to the SPSA.[5] And, if anything, the deposition testimony of Wilder's physician, Dr. Stephen Caplan, undermines any such argument.[6]

## C. RETALIATORY DISCHARGE

■ A *prima facie* case of retaliatory discharge is made out by showing that (1) Wilder engaged in a protected activity; (2) the SPSA took adverse employment action against Wilder; and (3) a causal connection exists between the protected activity and the adverse action. *Carter,* 33 F.3d at 460. The SPSA may rebut the *prima facie* case by articulating non-retaliatory reasons for its actions. The burden then shifts back to the plaintiff to show that those reasons are pretextual. *Id.*

■ Wilder filed two complaints with the EEOC; one on February 9, 1993 and another on September 9, 1993. It is uncontested that these filings constitute a protected activity. To fulfill the second prong—that Wilder suffered some adverse employment action— Plaintiff points to two incidents: first, the "heightened intensity" of harassment following the initial EEOC charge; second, the fact that Saunders required Wilder to report for work at 6:00 a.m. immediately following a week long hospital stay.

hours. But then at 302 Wilder says that Saunders failed to schedule him with enough overtime.

5. And, even if ordinary work related stress did contribute to the flare-ups, our opinion would not change. The federal antidiscrimination laws do not guarantee a stress free work environment. *Carter,* 33 F.3d at 459.

6. Dr. Caplan testified that he could not specifically attribute Wilder's "flare-ups" to the SPSA.

He also stated that, given the nature of Crohn's disease, Wilder would experience flare-ups regardless of his employment at the SPSA:

> Q. In your best estimation, would Mr. Wilder have continued to have problems associated with Crohn's Disease if he had not worked for SPSA.
> A. My opinion, I think that Mr. Wilder would have had episodes, flare-ups, of Crohn's Disease if he had not worked for the SPSA.

Simply put, Plaintiff does not document any incidents which would indicate a heightened intensity of harassment following the initial EEOC report. Plaintiff's memorandum points to a conversation in April of 1993 between Saunders and Gentry where Gentry said that if Saunders did not get rid of Wilder, then Gentry would get rid of Saunders. However, this conversation is consistent with the position of the SPSA that it wished to terminate Wilder because of his non-compliance with various SPSA procedures. More importantly, Wilder does not indicate how this conversation resulted in any adverse action whatsoever. That is, the mere fact that such a conversation transpired is not in and of itself an adverse employment action.

The second allegation is that Saunders required Wilder to report for work at six a.m. following a week long hospital stay. The precise contours of this issue are unclear from the record. Specifically, the Court is uncertain whether Wilder was *required* to report at six a.m., and how many times this requirement was imposed.[7]

However, even assuming that the six a.m. requirement did constitute an adverse employment action, Plaintiff nevertheless fails to demonstrate that it was caused by the protected activity. As indicated, causation is a necessary element of the *prima facie* case. *Id.* Yet, in his memorandum, Plaintiff does nothing to link up this adverse action with Wilder's reporting. In fact, the Plaintiff's argument does not even attempt to establish the most basic evidence of causation: a temporal nexus between the reporting and the alleged violation. *See Id.* at 460 (a temporal nexus between the protected activity and the alleged violation is indirect proof of causation).

## CONCLUSION

For the reasons stated above, the Plaintiff's claims under Title VII, the ADA, § 1981 and § 1983 are **DISMISSED.** The Clerk is

directed to send a copy of this Memorandum Order to all counsel of record.

**IT IS SO ORDERED.**

---

7. What more, even if true, we are not convinced that such a requirement would be adverse given the minimal staffing of the Suffolk work site and the fact that Plaintiff missed so many days of work. Indeed, it seems only fair that, when Wilder was available, he carry a proportional share of the workload. There is no evidence that Wilder required additional time after his hospital stay in order to further recuperate.