**Rhonda PUCKETT, Plaintiff,**

v.

**CITY OF PORTSMOUTH, Defendant.**

**Civil Action No. 2:03cv747.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Sept. 30, 2005.

John Michael Loeschen, The Krasnow Law Firm, Roanoke, VA, for Plaintiff.

Heather Ann Mullen, Kaufman & Canoles PC, Norfolk, VA, for Defendant.

### OPINION AND ORDER

KELLEY, District Judge.

Plaintiff Rhonda Puckett voluntarily resigned as a trainee with the Police Department of defendant City of Portsmouth, Virginia (the "City"). She subsequently filed this action against the City alleging, among other things, that she suffered employment discrimination and was subjected to a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., and in violation of 42 U.S.C. §§ 1981 and 1983. The matter is now before the Court on the City's Motion for Summary Judgment. (Docket No. 8.) For the reasons stated below, the Motion is **GRANTED.**

### I. Factual and Procedural History

Puckett is an African–American female and former employee of the City's Police Department. Puckett was employed by the City as a police officer trainee in July 2002. As part of her training, Puckett attended an orientation program in which she received a copy of the City's anti-harassment policy. The City's anti-harassment policy prohibits, among other things, racial harassment, including "epithets, slurs, negative stereotyping, or threatening, intimidating, or hostile acts that relate to race."

In October 2002, Puckett graduated from the Hampton Roads Criminal Justice Training Academy and was promoted to the position of police officer. At that time, Puckett received a "pay grade increase," resulting in an increase in her base salary. At no time during her employment with the City did Puckett experience a decrease in her salary and wages. Puckett's employment benefits remained the same throughout the entire term of her employment.

From October 2002 through December 2002, Puckett attended the Portsmouth Police Training Academy for additional specialized training. Following the completion of her training, Puckett entered into the Police Department's "field training program." As part of this program, police recruits are assigned on a rotating basis by the Training Department to work in the field with experienced "field training officers." Although field training officers evaluate the work performance of the trainees assigned to them, they do not make decisions concerning the trainees' employment or compensation. Field training officers cannot hire, fire, promote, demote, or discipline any of their trainees.

From February 15, 2003 through March 14, 2003, Puckett was assigned to work with Field Training Officer Steve Walker. At the time, Puckett was the only African–American female trainee participating in the field training program. It was during this time period that three incidents occurred which form the basis of Puckett's claims.

On February 20, 2003, Puckett was driving a police vehicle with Officer Walker seated next to her in the front passenger seat. As Puckett drove through the City, Officer Walker asked her various questions concerning their current geographic location, nearby landmarks, and directions. After Puckett answered several of his questions incorrectly, Officer Walker rolled up a newspaper and used it to strike Puckett three times on the top of her head. (Puckett Dep. 36–39.) Officer Walker struck Puckett with the newspaper in a "[v]ery hard" manner, bringing tears to her eyes. (Puckett Dep. 38–39.)

Some time after February 20, 2003, Puckett and Officer Walker were dispatched to the scene of a house burglary. While at the scene, Puckett "had a lot of fingerprint dust on [her] face" after she had dusted several items for fingerprints. (Puckett Dep. 40–41.) After Puckett and Officer Walker returned to their police vehicle, Officer Walker told Puckett, "You look like a black man slapped you in the face. You need to clean that off." (Puckett Dep. 41.)

March 14, 2003, was Puckett's last day of field training with Officer Walker. Puckett was again driving a police vehicle with Officer Walker seated next to her in the front passenger seat. As Puckett was driving, Officer Walker asked her the address of a certain house. When Puckett gave an incorrect answer, Officer Walker "punched" her in her right arm. (Puckett Dep. 50.) Although Officer Walker had punched Puckett "[v]ery hard," resulting in Puckett being "[p]ushed ... over," Puckett's arm was not bruised. (Puckett Dep. 50–51.) When Puckett objected to Officer Walker's conduct, he replied that Puckett "deserved it." [1] (Puckett Dep. 51.)

On March 15, 2003, Puckett was assigned to a different field training officer as part of the normal rotation in the field training program. On March 16, 2003, Puckett "called in sick" and did not report to work.

On March 17, 2003, Puckett reported to work and met with two of her supervisors, Lieutenant Althea Floriano, the Director of Training, and Sergeant Sean Dunn, the Assistant Director of Training. Puckett informed Lieutenant Floriano and Sergeant Dunn of the three incidents involving Officer Walker. After Puckett informed them of her complaint, Lieutenant Floriano and Sergeant Dunn suggested that Puckett could go home for the rest of the day, which she did. Lieutenant Floriano and Sergeant Dunn "immediately decided" that no further trainees would be assigned to Officer Walker until an investigation was completed. (Floriano Affidavit ¶ 6.)

On March 18, 2003, Puckett used another "sick day" and did not report to work. On March 19, 2003, Puckett submitted a letter of resignation to the interim chief of police, Lieutenant Floriano, and Sergeant Dunn. (Puckett Dep. Ex. 10.) In her letter, Puckett stated that her resignation was "effective immediately." (Puckett Dep. Ex. 10.) Lieutenant Floriano told Puckett that Puckett would "regret" her decision. (Puckett Dep. 75.)

Puckett never asked to return to her employment with the Police Department. In July 2003, Puckett filed a complaint with the Equal Employment Opportunity Commission alleging, among other things, that she had been discriminated against on the basis of her race.

In October 2003, following completion of the investigation into Puckett's allegations, the Police Department determined that "Officer Walker had acted in an inappropriate and discourteous manner towards Officer Puckett, and that he had failed to comply with applicable City and Police Department policies." (Kitzerow Affidavit ¶ 6.) The Police Department formally relieved Officer Walker from his field training officer position, resulting in a reduction

---

1. The City denies that these incidents took place. (Answer ¶ 5—Docket No. 5.) However, in deciding the City's Motion for Summary Judgment, the Court must view the facts, and the inferences reasonably drawn from those facts, in the light most favorable to Puckett. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Smith v. Continental Cas. Co.,* 369 F.3d 412, 417 (4th Cir. 2004); *Nguyen v. CNA Corp.,* 44 F.3d 234, 237 (4th Cir.1995).

in Officer Walker's pay and the loss of certain privileges. Officer Walker was also suspended from work for three days without pay. These disciplinary actions will have an impact on Officer Walker's potential to qualify for future promotions.

In November 2003, Chief Kitzerow sent Puckett a letter informing her that a "thorough investigation" had been conducted in response to her allegations. (Puckett Dep. Ex. 11.) Chief Kitzerow further informed Puckett of the Police Department's conclusion that Officer Walker had "acted in an inappropriate and discourteous manner" toward her. Although Chief Kitzerow assured Puckett that "appropriate remedial and corrective action" had been taken against Officer Walker, he did not specify the disciplinary action that was taken. (Puckett Dep. Ex. 11.)

In October 2003, prior to receiving Chief Kitzerow's letter, Puckett filed the instant action, alleging, among other things, that the City violated her rights under Title VII and under sections 1981 and 1983. The gravamen of Puckett's claims is that she suffered an "adverse employment action" when the City failed to inform her promptly of the action it would take against Officer Walker to remedy the alleged discrimination. Puckett contends that "[i]t is an adverse employment action for an employer to sit idly by and do nothing." (Pl. Memo. in Resp. 11—Docket No. 13.)

Puckett testified in deposition that when she informed Lieutenant Floriano and Sergeant Dunn of her allegations against Officer Walker, Sergeant Dunn stated to her, "I don't believe Steve Walker is a racist." (Puckett Dep. 69–71.) According to Puckett, she replied to Sergeant Dunn, "I never said he was." (Puckett Dep. 69–70.)

Puckett further testified that Lieutenant Floriano told her that when she was a recruit, she "used to get hit all the time,

but [she] just sucked it up." (Puckett Dep. 71–72.) Puckett also stated that when she explained to Renae Galimore of the City's Human Resources Department the reasons for her resignation, Galimore told Puckett, "Steve Walker is a racist and . . . you need to take this all the way to the chief." (Puckett Dep. 85–86.)

Puckett testified that neither Lieutenant Floriano nor Sergeant Dunn informed her of what action, if any, they proposed to take in response to her allegations. (Puckett Dep. 72.) However, Puckett did not ask them about "any specific actions" they might pursue. (Puckett Dep. 72, 144–45.) Puckett claimed that she felt "forced to resign" because of "field intimidation" due to the fact that she was still in field training and that Officer Walker was an eight-year veteran with the Police Department. (Puckett Dep. 78.)

Puckett further testified that she thought that Officer Walker's conduct toward her was based on race because of his reference to a "black man" during the fingerprint incident and because she did not hear any other recruits complain about similar conduct from either Officer Walker or the other field training officers. (Puckett Dep. 41, 53.) However, Puckett conceded that she did not know if any other recruits, whether African–American or Caucasian, had been exposed to similar conduct, and she had not even asked any of them whether they endured similar treatment during the field training program. (Puckett Dep. 41–43, 53, 63–64.) Puckett stated that she did not have any information concerning the manner in which Officer Walker had treated the other trainees. (Puckett Dep. 63–64, 112–13.) Puckett further explained, "I just know what happened to me." (Puckett Dep. 113.)

Puckett also testified that she did not think that Officer Walker was following a policy or practice of either the Police Department or the City when he struck her and made the comment about fingerprint dust on her face. (Puckett Dep. 104–08.) Puckett conceded that she was unaware of any custom or policy in either the Police Department or the City "to have officers make comments or hit individuals ... because of their race." (Puckett Dep. 107–08.) Puckett acknowledged that Officer Walker's conduct was in violation of the City's anti-harassment policy. (Puckett Dep. 105–07.)

*II. Principles of Summary Judgment*

The standards courts apply in their consideration of motions for summary judgment are well-established. Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Hunt v. Cromartie*, 526 U.S. 541, 549, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Seabulk Offshore, Ltd. v. American Home Assurance Co.*, 377 F.3d 408, 418 (4th Cir.2004); *Walton v. Greenbrier Ford, Inc.*, 370 F.3d 446, 449 (4th Cir.2004).

An otherwise proper summary judgment motion will not be defeated by a mere factual dispute between the parties unless the dispute concerns a "genuine issue of material fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505; *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 519 (4th Cir.2003). A "material fact" is a fact that might affect the outcome of a party's case. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir.2001); *Commerce Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 209 (4th Cir.2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Hooven–Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir.2001). A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Commerce Funding Corp.*, 249 F.3d at 209–10; *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 614 (4th Cir.1999).

Summary judgment shall be granted if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548; *see also Hooven–Lewis*, 249 F.3d at 265; *Johnson v. Pearson*, 316 F.Supp.2d 307, 313 (E.D.Va.2004). The moving party has the initial burden to show the absence of an essential element of the nonmoving party's case and to demonstrate that the moving party is entitled to judgment as a matter of law. *Honor v. Booz–Allen & Hamilton, Inc.*, 383 F.3d 180, 185 (4th Cir.2004); *McLean v. Patten Cmtys., Inc.*, 332 F.3d 714, 718 (4th Cir.2003); *see Celotex Corp.*, 477 U.S. at 322–25, 106 S.Ct. 2548. When the moving party has met its burden to show that the evidence is insufficient to support the nonmoving party's case, the burden then shifts to the non-

moving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Honor,* 383 F.3d at 185; *McLean,* 332 F.3d at 718–19.

In meeting this burden, the nonmoving party must "go beyond the pleadings" and present affidavits or designate specific facts in depositions, answers to interrogatories, and admissions on file to establish a genuine issue of material fact. *Celotex Corp.,* 477 U, 106 S.Ct. 2548.S. at 324; *see also M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.,* 981 F.2d 160, 163 (4th Cir.1993); *Parker v. Westat, Inc.,* 301 F.Supp.2d 537, 540 (E.D.Va.2004). However, the nonmoving party must rely on more than conclusory allegations, "mere speculation," the "building of one inference upon another," the "mere existence of a scintilla of evidence," or the appearance of "some metaphysical doubt" concerning a material fact. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348; *Thompson v. Potomac Elec. Power Co.,* 312 F.3d 645, 649 (4th Cir.2002); *Stone v. Liberty Mut. Ins. Co.,* 105 F.3d 188, 191 (4th Cir.1997); *Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.,* 330 F.Supp.2d 668, 671 (E.D.Va.2004). The evidence presented must be such that a reasonable jury could find in favor of the nonmoving party. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Retail Servs. Inc. v. Freebies Publ'g,* 364 F.3d 535, 542 (4th Cir.2004); *Tao of Sys. Integration, Inc.,* 330 F.Supp.2d at 671.

Summary judgment is not a "disfavored procedural shortcut." *Celotex Corp.,* 477 U.S. at 327, 106 S.Ct. 2548; *Sibley v. Lutheran Hosp. of Md., Inc.,* 871 F.2d 479, 483 n. 9 (4th Cir.1989); *Brown v. Mitchell,* 327 F.Supp.2d 615, 628 (E.D.Va.2004). Rather, the summary judgment procedure is properly regarded as an "integral part" of the Federal Rules of Civil Procedure, which are designed to obtain a just, expeditious, and inexpensive resolution of every civil matter. *Celotex Corp.,* 477 U.S. at 327, 106 S.Ct. 2548; *Sibley,* 871 F.2d at 483 n. 9; *Graham v. PACTIV Corp. Benefits Comm.,* 301 F.Supp.2d 483, 491–92 (E.D.Va.2004).

■ A court "must take special care" when considering a summary judgment motion in an employment discrimination case because the employer's "motive is often the critical issue." *Beall v. Abbott Labs.,* 130 F.3d 614, 619 (4th Cir.1997); *Evans v. Techs. Applications & Serv. Co.,* 80 F.3d 954, 958 (4th Cir.1996); *Ballinger v. N.C. Agric. Extension Serv.,* 815 F.2d 1001, 1005 (4th Cir.1987). Nevertheless, summary judgment remains an appropriate disposition when the plaintiff is unable to prevail on his or her discrimination claims as a matter of law. *Beall,* 130 F.3d at 619; *Evans,* 80 F.3d at 958–59.

### III. Analysis

#### A. Employment Discrimination

■ The elements required to prove a *prima facie* case for employment discrimination are the same for claims made under either Title VII or sections 1981 and 1983.[2] *Mullen v. Princess Anne Volunteer*

---

2. Because Puckett has not presented any direct evidence of discrimination, the Court will examine her claims of discrimination using the burden-shifting framework established by the United States Supreme Court in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

*See Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 284–85 (4th Cir.2004); *Thompson,* 312 F.3d at 649; *Brinkley,* 180 F.3d at 606–07; *El v. Tek Sys., Inc.,* 311 F.Supp.2d 516, 519 (E.D.Va.2002); *Wilder v. Southeastern Pub. Serv. Auth.,* 869 F.Supp. 409, 413 (E.D.Va.1994). Under that frame-

*Fire Co.*, 853 F.2d 1130, 1136 (4th Cir. 1988); *Abasiekong v. City of Shelby*, 744 F.2d 1055, 1058 (4th Cir.1984); *Demuren v. Old Dominion Univ.*, 33 F.Supp.2d 469, 478 (E.D.Va.1999). To establish her *prima facie* case of discrimination, Puckett must prove that: (i) she is a member of a protected class; (ii) she suffered an "adverse employment action"; and (iii) at the time of the "adverse employment action," her job performance met her employer's legitimate expectations.[3] *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir.2004); *Brinkley*, 180 F.3d at 607; *see also Wilder v. Southeastern Pub. Serv. Auth.*, 869 F.Supp. 409, 413 (E.D.Va.1994).

A review of the facts, taken in the light most favorable to Puckett, reveals that she has failed to establish a *prima facie* case. Puckett cannot prove that she suffered "adverse employment action."

 To establish the existence of an "adverse employment action," Puckett must prove that the City committed a discriminatory act that adversely affected the terms, conditions, or benefits of her employment. *See James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir.2004); *Thompson*, 312 F.3d at 650–51; *Von Gunten v. Maryland*, 243 F.3d 858, 866 (4th Cir.2001). However, there is no evidence in the record before the Court that Puckett experienced any adverse effect in the terms, conditions, or benefits of

work, a plaintiff asserting a claim under Title VII has the initial burden to prove a *prima facie* case of discrimination by a preponderance of the evidence. *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. 1817; *see also Raytheon Co. v. Hernandez*, 540 U.S. 44, 50, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Mackey v. Shalala*, 360 F.3d 463, 468 (4th Cir.2004).

Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for the defendant's employment action. *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. 1817; *see also Raytheon Co.*, 540 U.S. at 50, 124 S.Ct. 513; *St. Mary's Honor Ctr.*, 509 U.S. at 506–07, 113 S.Ct. 2742; *Mackey*, 360 F.3d at 468. If the defendant meets this burden, then "the presumption raised by the prima facie case is rebutted" and the presumption "drops from the case." *St. Mary's Honor Ctr.*, 509 U.S. at 507, 113 S.Ct. 2742 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 and n. 10, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)); *see also Mackey*, 360 F.3d at 468. The plaintiff then must have a "full and fair opportunity" to demonstrate, through the presentation of its own evidence and the cross-examination of the defendant's witnesses, that the defendant's proffered reason for its employment decision was not the true reason, but was

merely a pretext for discrimination. *St. Mary's Honor Ctr.*, 509 U.S. at 507–08, 113 S.Ct. 2742; *Burdine*, 450 U.S. at 253, 255–56, 101 S.Ct. 1089; *Hill*, 354 F.3d at 285; *see Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 133 (4th Cir.2002). Although the *McDonnell Douglas* framework shifts the burden of production between the parties, the plaintiff retains the "ultimate burden" of persuasion. *St. Mary's Honor Ctr.*, 509 U.S. at 508, 113 S.Ct. 2742; *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089; *see Hill*, 354 F.3d at 285.

3. A *prima facie* case for racial discrimination traditionally includes a fourth factor: whether the plaintiff's job position remained open to, or was filled by, similarly qualified applicants outside of the plaintiff's protected class. *See St. Mary's Honor Ctr.*, 509 U.S. at 506, 113 S.Ct. 2742; *Hill*, 354 F.3d at 285; *Brinkley*, 180 F.3d at 607; *Wilder*, 869 F.Supp. at 413 n. 1. However, the proof required for a plaintiff to establish a *prima facie* case will vary depending on the facts of each case. *McDonnell Douglas Corp.*, 411 U.S. at 802 n. 13, 93 S.Ct. 1817. As such, "the prima facie proof required from [the plaintiff] is not necessarily applicable in every respect to differing factual situations." *Id.* Because Puckett voluntarily resigned her employment with the City's Police Department, the Court need not consider this fourth factor in the present case. *See Wilder*, 869 F.Supp. at 413 n. 1.

her employment. Puckett received a promotion and a salary increase during her relatively brief tenure with the City. Puckett's wages were never reduced, and her employment benefits remained unchanged throughout the entire term of her employment.

Puckett advances the novel argument that she suffered "adverse employment action" because the City failed to advise her promptly of the remedial action it would take in response to her complaints. This argument is logically unpersuasive and Puckett has not cited any cases in which the failure to advise a claimant of likely future remedial action has been found to constitute "adverse employment action."

Puckett's argument, if taken to its logical conclusion, would effectively place Puckett in control of the disciplinary action taken against Officer Walker. If the City were required to promptly advise Puckett of its proposed response, Puckett would then have the opportunity to complain that the contemplated remedies were inadequate to address her complaints. The City would very likely perceive itself compelled to tailor its remedial actions to Puckett's desired specifications in order to avoid further complaints from Puckett and the prospect of expensive litigation should Puckett believe that her demands were not satisfied. Puckett would thus sit in the proverbial "driver's seat" regarding the punishment to be meted out to a fellow employee.

This Court is unwilling to bestow such authority upon any complainant. To allow complainants such as Puckett the authority to decide the appropriate corrective measures to be taken against their fellow co-workers would assuredly upset the delicate balance of employee relations necessary to the health and vitality of a successful working environment. Furthermore, such a requirement would widen even further the floodgates of employment discrimination litigation as complainants, both the well-intentioned and the ill-motivated, would be encouraged to seek redress in the courts (or, at the very least, to threaten such action) in an effort to control the conduct of their employer and fellow employees. Also, those employees who are punished by their employers as the result of such complaints may perceive that they are being unfairly treated, and thus turn to the courts to rectify the unfairness.

Puckett's argument is further weakened by the fact that, prior to Puckett's resignation, the City actually had begun to take action in response to Puckett's complaint. After learning of Puckett's allegations, Lieutenant Floriano and Sergeant Dunn immediately removed Officer Walker from the field training program pending an investigation.

Additionally, prior to her voluntary resignation, Puckett did not give the City a reasonable opportunity to respond to her allegations. Puckett first complained to her immediate supervisors about Officer Walker's conduct on March 17, 2003. After she discussed her complaint with her supervisors, Puckett did not return to duty and left work for the remainder of the day. The next day, March 18, 2003, Puckett did not report to work. On March 19, 2003, a mere two days after she initially informed her supervisors of her complaint, Puckett submitted her letter of resignation. For all practical purposes, Puckett left her employment as soon as she reported Officer Walker's alleged misconduct, never to return.

 Puckett also argues that she suffered a "constructive discharge" from the police force. While a constructive discharge may constitute "adverse employment action" under certain circumstances, *see Munday v. Waste Mgmt. of N. Am.,*

*Inc.,* 126 F.3d 239, 243 (4th Cir.1997), those circumstances are not present in the instant case. Accordingly, Puckett cannot use the constructive discharge doctrine to prove her *prima facie* case.

■■■■ A constructive discharge occurs when an employee is forced to quit his or her job because the employer deliberately made the employee's working conditions intolerable. *Munday,* 126 F.3d at 244; *Bristow v. The Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985). To establish a constructive discharge in the present case, Puckett must prove: (i) that the City's actions were deliberate, and motivated by racial bias; and, (ii) that her working conditions were objectively intolerable. *See Honor,* 383 F.3d at 186–87; *Munday,* 126 F.3d at 244; *Bristow,* 770 F.2d at 1255. "Deliberateness exists only if the actions complained of were intended by the employer as an effort to force the plaintiff to quit." *Matvia v. Bald Head Island Mgmt., Inc.,* 259 F.3d 261, 272 (4th Cir.2001) (quoting *Taylor v. Va. Union Univ.,* 193 F.3d 219, 237 (4th Cir.1999)).

■■■■ The intolerability of the employee's working conditions is assessed using an objective standard, *i.e.,* whether a reasonable person in the employee's position would have felt forced to resign from his or her employment. *Matvia,* 259 F.3d at 272; *Munday,* 126 F.3d at 244; *Taylor,* 193 F.3d at 237. "[T]he law does not permit an employee's subjective perceptions to govern a claim of constructive discharge." *Honor,* 383 F.3d at 187 (quoting *Goldsmith v. Mayor & City Council of Baltimore,* 987 F.2d 1064, 1072 (4th Cir. 1993)); *see also Bristow,* 770 F.2d at 1255. "[D]issatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Honor,* 383 F.3d at 187 (quoting *Williams v. Giant Food*

*Inc.,* 370 F.3d 423, 434 (4th Cir.2004)); *see also James,* 368 F.3d at 378.

■■■ There is no evidence in the record that the City or anyone acting on the City's behalf deliberately attempted to force Puckett to quit her job. In fact, when Puckett submitted her resignation, Lieutenant Floriano stated that Puckett would regret her decision.

Nor is there any evidence that the City was aware of Officer Walker's conduct or that the City authorized, condoned, or encouraged any racially discriminatory behavior. In fact, the evidence is to the contrary. The City had in place an anti-harassment policy that prohibited race-based employment discrimination.

■■■ While Puckett may have subjectively believed that her working conditions were intolerable, the record reveals that Puckett's working conditions were not objectively intolerable. The three incidents involving Officer Walker, whether viewed together or in insolation, do not constitute an objectively intolerable working condition. These three incidents occurred during a brief interval out of the total time period of Puckett's employment with the City. The last such incident occurred on Puckett's last day of field training with Officer Walker. There is no indication in the record that Puckett would ever be assigned to work with Officer Walker in the future. In fact, once Puckett made her complaint, Officer Walker was removed immediately from the field training rotation and was no longer assigned any trainees.

There is also no evidence that the City was motivated by racial bias in any of its alleged acts or omissions. Further, there is no evidence that Officer Walker himself was motivated by any racial hostility toward Puckett. Officer Walker's single remark referencing race, while unprofession-

al and distasteful, does not make him a racist.[4] Neither is there any indication that Puckett's race was a motivating factor when Officer Walker struck her with the newspaper or punched her in the arm. If anything, it appears that Officer Walker had a problem controlling his anger at Puckett's inability to provide correct answers in response to his questions.

Puckett offered no evidence that Officer Walker treated any other trainees, whether African–American or Caucasian, differently than he treated her. Indeed, the only evidence in the record on this point suggests that Officer Walker treated everyone equally boorishly. *See* Puckett Dep. 71–72 (Lt. Floriano stated that she used to get hit all the time.)

### B. Hostile Work Environment

■ To establish her claim for a racially hostile work environment, Puckett must show that she was subjected to conduct that was: (i) unwelcome; (ii) based on race; and, (iii) sufficiently pervasive or severe to alter the conditions of her employment and create an abusive atmosphere. *See Honor,* 383 F.3d at 190; *White v. BFI Waste Servs., LLC,* 375 F.3d 288, 296–97 (4th Cir.2004); *Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 183 (4th Cir.2001). Further, Puckett must also prove that "there is some basis for imposing liability" on the City. *See Honor,* 383 F.3d at 190; *White,* 375 F.3d at 297; *Spriggs,* 242 F.3d at 184.

■ The determination whether a hostile work environment has been created includes both objective and subjective components. *Anderson v. G.D.C., Inc.,* 281 F.3d 452, 459 (4th Cir.2002); *see Harris v.*

*Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The work environment must be such that a reasonable person would find it hostile or abusive, and the plaintiff must also "subjectively perceive the environment to be abusive." *Harris,* 510 U.S. at 21, 114 S.Ct. 367; *see also Equal Employment Opportunity Comm'n v. R & R Ventures,* 244 F.3d 334, 339 (4th Cir.2001). "In assessing whether a work environment is objectively hostile, a court must consider 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Anderson,* 281 F.3d at 459 (quoting *Harris,* 510 U.S. at 23, 114 S.Ct. 367); *see also R & R Ventures,* 244 F.3d at 339.

■ In general, "merely offensive" conduct and "isolated incidents" do not serve to create a hostile work environment. *See Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 271, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001); *Harris,* 510 U.S. at 21, 114 S.Ct. 367; *Brinkley,* 180 F.3d at 608. "Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace." *Hopkins v. Baltimore Gas & Elec. Co.,* 77 F.3d 745, 754 (4th Cir.1996); *see also Brinkley,* 180 F.3d at 608.

Puckett argues that the City perpetuated a hostile work environment because it failed to assure her that she could work in a "hostile-free" environment after she made her complaint. This is a rehash of Puckett's earlier argument that the City

---

**4.** Galimore's statement that Officer Walker is a racist is not evidence that Officer Walker was motivated by race in his conduct toward Puckett. Regardless of its admissibility, Galimore's statement merely expresses her personal opinion of Officer Walker and there is nothing in the record to identify the factual basis underlying her opinion. *See Wilder,* 869 F.Supp. at 416.

should have cleared with her the disciplinary action it proposed to take against Officer Walker.

Puckett further asserts that an examination of the "totality of the circumstances" reveals that Officer Walker's conduct was indeed discriminatory. Puckett contends that she was the only black trainee and that she was physically threatened and assaulted. Puckett claims that she found Officer Walker's conduct to be humiliating, degrading, and "certainly more than an offensive utterance." (Pl. Memo. in Resp. 13—Docket No. 13.) Puckett also contends that Officer Walker's conduct interfered with her performance on the job. The record does not support any of these factual contentions.

There is simply no evidence in the record that Officer Walker's conduct towards Puckett was based on her race. The record contains nothing more than Puckett's subjective and speculative belief that Officer Walker's rude and insensitive conduct was racially motivated.

▆ Moreover, the three isolated incidents of Officer Walker's behavior do not amount to conduct sufficiently pervasive or severe to alter the conditions of Puckett's employment or to create an abusive atmosphere. While the conduct was boorish, there is no evidence that it unreasonably interfered with Puckett's work performance. Puckett offers no evidence that she had any difficulty fulfilling her duties as a trainee at any time during her employment, including when she was assigned to train with Officer Walker. In fact, after the third and final incident involving Officer Walker, Puckett was no longer assigned to work with him, and he was removed from the field training rotation altogether. Finally, any purported failure on the part of the City to provide Puckett with a remedial action plan following her complaint cannot serve to perpetuate a hostile work environment because Puckett had removed herself from the work environment prior to any such alleged failure.[5]

## C. Claims under Sections 1981 and 1983

The Court's ruling that Puckett has failed to prove a *prima facie* case of either employment discrimination or a hostile work environment dooms her claims under 42 U.S.C. §§ 1981 and 1983. These claims would be dismissed in any event because Puckett has failed to establish municipal liability on the part of the City.

▆ A plaintiff seeking to impose section 1983 liability on a municipality must identify a municipal "policy" or "custom" that caused the plaintiff's injuries. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *see also Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *Riddick v. Sch. Bd. of the City of Portsmouth*, 238 F.3d 518, 522 (4th Cir.2000). Thus, Puckett was required to adequately plead and prove the existence of an official policy or custom that was fairly attributable to the City and that proximately caused the deprivation of her rights. *See Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th

---

**5.** The Court's ruling renders unnecessary a determination of whether Puckett established a basis for imposing liability on the City for her hostile work environment/constructive discharge claims. Accordingly, the Court need not consider the City's arguments concerning affirmative defenses raised under the

*"Ellerth/Faragher* Test." *See generally Pa. State Police v. Suders*, 542 U.S. 129, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004); *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

Cir.1999); *Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir.1994). This standard also applies to Puckett's claims made under section 1981. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735–36, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 965 n. 3 (4th Cir.1995); *Dennis v. County of Fairfax*, 55 F.3d 151, 156 (4th Cir.1995); *see also Wilder*, 869 F.Supp. at 417.

Puckett has failed to put forth any evidence proving the existence of a custom or policy attributable to the City that caused a deprivation of her rights. If anything, the evidence revealed just the opposite— that the City had an anti-harassment policy in place which prohibited discriminatory conduct on the basis of race. Puckett was not only aware of this anti-harassment policy, she even claimed in her deposition that Officer Walker's conduct violated the policy.[6]

Puckett conceded during her deposition testimony that she did not believe that Officer Walker was following a custom, practice, or policy of either the City or the Police Department when he struck her with the newspaper, punched her in the arm, and made the comment concerning the fingerprint dust on her face. Puckett further conceded that neither the City nor the Police Department had any policy, custom, or practice to subject African–American trainees to discriminatory treatment. These concessions prohibit the imposition of municipal liability.

---

**6.** Lieutenant Floriano's alleged statement, that she "used to get hit all the time," does not establish a custom or policy of discrimination against African–American trainees. First, Lieutenant Floriano is a Caucasian female. (Floriano Affidavit ¶ 1.) Accordingly, even if Lieutenant Floriano had been treated in a manner similar to Puckett, this would not

### IV. CONCLUSION

For the reasons stated above, the City's Motion for Summary Judgment is **GRANTED**.

The Clerk is hereby **DIRECTED** to forward a copy of this Order and Opinion to all counsel of record.

**IT IS SO ORDERED.**

support Puckett's claim that she had suffered racial discrimination. Second, Floriano's alleged statement concerned events that transpired in the past and do not shed light on whether there is a current custom or practice for field training officers to strike recruits and make race-based comments as part of the field training process.